UNITED STATES *v.* ORTIZ

No. 73–2050.   Argued February 18, 1975—Decided June 30, 1975

*Mark L. Evans* argued the cause for the United States. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Petersen, Acting Assistant Attorney General Keeney, Sidney M. Glazer,* and *Jerome M. Feit.*

*Charles M. Sevilla,* by appointment of the Court, 420 U. S. 905, argued the cause for respondent.   With him on the brief was *John J. Cleary.**

MR. JUSTICE POWELL delivered the opinion of the Court.

Border Patrol officers stopped respondent's car for a routine immigration search at the traffic checkpoint

**Sanford Jay Rosen* filed a brief for the Mexican American Legal Defense and Educational Fund as *amicus curiae* urging affirmance.

on Interstate Highway 5 at San Clemente, Cal., on November 12, 1973. They found three aliens concealed in the trunk, and respondent was convicted on three counts of knowingly transporting aliens who were in the country illegally. The Court of Appeals for the Ninth Circuit reversed the conviction in an unreported opinion, relying on dictum in its opinion in *United States* v. *Bowen,* 500 F. 2d 960 (CA9 1974), aff'd, *post,* p. 916, to the effect that our decision in *Almeida-Sanchez* v. *United States,* 413 U. S. 266 (1973), required probable cause for all vehicle searches in the border area, whether conducted by roving patrols or at traffic checkpoints. We granted certiorari. 419 U. S. 824 (1974).

Nothing in this record suggests that the Border Patrol officers had any special reason to suspect that respondent's car was carrying concealed aliens. Nor does the Government contend that the San Clemente checkpoint is a functional equivalent of the border. Brief for United States 16. The only question for decision is whether vehicle searches at traffic checkpoints, like the roving-patrol search in *Almeida-Sanchez,* must be based on probable cause.

## I

In *Almeida-Sanchez* we rejected the Government's contention that the Nation's strong interest in controlling immigration and the practical difficulties of policing the Mexican border combined to justify dispensing with both warrant and probable cause for vehicle searches by roving patrols near the border. The facts did not require us to decide whether the same rule would apply to traffic checkpoints, which differ from roving patrols in several important respects. 413 U. S., at 273; *id.,* at 276 (POWELL, J., concurring).

A consolidated proceeding on motions to suppress in this and similar cases produced an extensive factual

record on the operation of traffic checkpoints in southern California. *United States* v. *Baca,* 368 F. Supp. 398 (SD Cal. 1973). The San Clemente checkpoint is 62 air miles and 66 road miles north of the Mexican border. It is on the principal highway between San Diego and Los Angeles, and over 10 million vehicles pass the checkpoint in a year. *United States* v. *Martinez-Fuerte,* 514 F. 2d 308, 312 (CA9 1975). The District Court in *Baca* described the checkpoint as follows:

> "Approximately one mile south of the checkpoint is a large black on yellow sign with flashing yellow lights over the highway stating 'ALL VEHICLES, STOP AHEAD, 1 MILE.' Three-quarters of a mile further north are two black on yellow signs suspended over the highway with flashing lights stating 'WATCH FOR BRAKE LIGHTS.' At the checkpoint, which is also the location of a State of California weighing station, are two large signs with flashing red lights suspended over the highway. These signs each state 'STOP HERE—U. S. OFFICERS.' Placed on the highway are a number of orange traffic cones funneling traffic into two lanes where a Border Patrol agent in full dress uniform, standing behind a white on red 'STOP' sign checks traffic. Blocking traffic in the unused lanes are official U. S. Border Patrol vehicles with flashing red lights. In addition, there is a permanent building which houses the Border Patrol office and temporary detention facilities. There are also floodlights for nighttime operation." 368 F. Supp., at 410-411.

The Border Patrol would prefer to keep this checkpoint in operation continuously, but bad weather, heavy traffic, and personnel shortages keep it closed about one-third of the time. When it is open, officers screen all northbound traffic. If anything about a vehicle or its

occupants leads an officer to suspect that it may be carrying aliens, he will stop the car and ask the occupants about their citizenship. If the officer's suspicion persists, or if the questioning enhances it, he will "inspect" portions of the car in which an alien might hide.[1] Operations at other checkpoints are similar, although the traffic at some is light enough that officers can stop all vehicles for questioning and routinely inspect more of them.

The Government maintains that these characteristics justify dispensing with probable cause at traffic checkpoints despite the Court's holding in *Almeida-Sanchez*. It gives essentially two reasons for distinguishing that case. First, a checkpoint officer's discretion in deciding which cars to search is limited by the location of the checkpoint. That location is determined by high-level Border Patrol officials, using criteria that include the degree of inconvenience to the public and the potential for safe operation, as well as the potential for detecting and deterring the illegal movement of aliens. By contrast, officers on roving patrol were theoretically free before *Almeida-Sanchez* to stop and search any car within 100 miles of the border. Second, the circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop. Roving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At

---

[1] Such places typically include the trunk, under the hood, and beneath the chassis. If the vehicle is a truck, a camper, or the like, the officer inspects the enclosed portion as well. But an immigration inspection is not always so confined. In *Almeida-Sanchez* v. *United States*, 413 U. S. 266 (1973), the officer removed the back seat cushion because there were reports that aliens had been found seated upright behind seats from which the springs had been removed. *Id.*, at 286 (WHITE, J., dissenting).

traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.

These differences are relevant to the constitutional issue, since the central concern of the Fourth Amendment is to protect liberty and privacy from arbitrary and oppressive interference by government officials. *Camara* v. *Municipal Court,* 387 U. S. 523, 528 (1967); *Schmerber* v. *California,* 384 U. S. 757, 767 (1966). The Fourth Amendment's requirement that searches and seizures be reasonable also may limit police use of unnecessarily frightening or offensive methods of surveillance and investigation. See, *e. g., Terry* v. *Ohio,* 392 U. S. 1, 16–17 (1968); *Camara, supra,* at 531; *Schmerber, supra,* at 771–772. While the differences between a roving patrol and a checkpoint would be significant in determining the propriety of the stop, which is considerably less intrusive than a search, *Terry* v. *Ohio, supra,* they do not appear to make any difference in the search itself. The greater regularity attending the stop does not mitigate the invasion of privacy that a search entails. Nor do checkpoint procedures significantly reduce the likelihood of embarrassment. Motorists whose cars are searched, unlike those who are only questioned, may not be reassured by seeing that the Border Patrol searches other cars as well. Where only a few are singled out for a search, as at San Clemente, motorists may find the searches especially offensive. See Note, Border Searches and the Fourth Amendment, 77 Yale L. J. 1007, 1012–1013 (1968).

Moreover, we are not persuaded that the checkpoint limits to any meaningful extent the officer's discretion to select cars for search. The record in the consolidated proceeding indicates that only about 3% of the cars that

pass the San Clemente checkpoint are stopped for either questioning or a search, 368 F. Supp., at 411. Throughout the system, fewer than 3% of the vehicles that passed through checkpoints in 1974 were searched, Brief for United States 29, and no checkpoint involved in *Baca* reported a search rate of more than 10% or 15%. 368 F. Supp., at 412–415. It is apparent from these figures that checkpoint officers exercise a substantial degree of discretion in deciding which cars to search. The Government maintains that they voluntarily exercise that discretion with restraint and search only vehicles that arouse their suspicion, and it insists the officers should be free of judicial oversight of any kind. Viewed realistically, this position would authorize the Border Patrol to search vehicles at random, for no officer ever would have to justify his decision to search a particular car.

This degree of discretion to search private automobiles is not consistent with the Fourth Amendment. A search, even of an automobile, is a substantial invasion of privacy.[2] To protect that privacy from official arbitrariness, the Court always has regarded probable cause as the minimum requirement for a lawful search. *Almeida-Sanchez*, 413 U. S., at 269–270; *Chambers* v. *Maroney*, 399 U. S. 42, 51 (1970). We are not persuaded that the differences between roving patrols and traffic checkpoints justify dispensing in this case with the safeguards we required in *Almeida-Sanchez*. We therefore follow that decision and hold that at traffic checkpoints removed from the border and its functional equivalents,

---

[2] The degree of the invasion of privacy in an automobile search may vary with the circumstances, as there are significant differences between "an automobile and a home or office." *Chambers* v. *Maroney*, 399 U. S. 42, 48 (1970); *Almeida-Sanchez* v. *United States*, 413 U. S., at 279 (POWELL, J., concurring).

officers may not search private vehicles without consent or probable cause.[3]

The Government lists in its reply brief some of the factors on which officers have relied in deciding which cars to search. They include the number of persons in a vehicle, the appearance and behavior of the driver and passengers, their inability to speak English, the responses they give to officers' questions, the nature of the vehicle, and indications that it may be heavily loaded. All of these factors properly may be taken into account in deciding whether there is probable cause to search a particular vehicle. In addition, as we note today in *United States* v. *Brignoni-Ponce, ante,* at 884–885, the officers are entitled to draw reasonable inferences from these facts in light of their knowledge of the area and their prior experience with aliens and smugglers. In this case, however, the officers advanced no special reasons for believing respondent's vehicle contained

---

[3] Not every aspect of a routine automobile "inspection," as described in n. 1, *supra,* necessarily constitutes a "search" for purposes of the Fourth Amendment. There is no occasion in this case to define the exact limits of an automobile "search."

Nor do we have occasion to decide whether a warrant could issue approving checkpoint searches based on information about the area as a whole, in the absence of cause to believe that a particular car is carrying concealed aliens, because the officers had no such warrant in this case and had not tried to obtain one. See *Almeida-Sanchez* v. *United States, supra,* at 275 (POWELL, J., concurring); *Camara* v. *Municipal Court,* 387 U. S. 523 (1967). We also need not decide whether checkpoints and roving patrols must be treated the same for all purposes, or whether Border Patrol officers may lawfully stop motorists for questioning at an established checkpoint without reason to believe that a particular vehicle is carrying aliens. Cf. *United States* v. *Brignoni-Ponce, ante,* p. 873. Nor do we suggest that probable cause would be required for all inspections of private motor vehicles. It is quite possible, for example, that different considerations would apply to routine safety inspections required as a condition of road use.

aliens. The absence of probable cause makes the search invalid.

## II

The Government also contends that even if *Almeida-Sanchez* applies to checkpoint searches, the Court of Appeals erred in voiding this search because it occurred after the date of decision in *Almeida-Sanchez* but before the Court of Appeals stated in *United States* v. *Bowen, supra,* that it would require probable cause for checkpoint searches. Examination of the Government's brief in the Ninth Circuit indicates that it did not raise this question below. On the contrary, it represented to the court that the decision in *Bowen* would be "determinative of the issues in this case." We therefore decline to consider this issue, which was raised for the first time in the petition for certiorari.

*Affirmed.*

MR. JUSTICE REHNQUIST, concurring.

I joined the dissent of my Brother WHITE in *Almeida-Sanchez* v. *United States,* 413 U. S. 266 (1973), and recognize that the present decision is an extension of the unsound rule announced in that case. I nonetheless join the opinion of the Court, because a majority of the Court still adheres to *Almeida-Sanchez* and because I agree with the Court's analysis of the significance of the Government's proffered distinctions between roving and fixed-checkpoint searches.

I wish to stress, however, that the Court's opinion is confined to full searches, and does not extend to fixed-checkpoint stops for the purpose of inquiring about citizenship. Such stops involve only a modest intrusion, are not likely to be frightening or significantly annoying, are regularized by the fixed situs, and effectively serve the important national interest in controlling illegal

entry. I do not regard such stops as unreasonable under the Fourth Amendment, whether or not accompanied by "reasonable suspicion" that a particular vehicle is involved in immigration violations, cf. *United States* v. *Brignoni-Ponce, ante,* p. 873, and I do not understand today's opinion to cast doubt upon their constitutionality.

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE BLACKMUN joins, concurring in the judgment.*

Like MR. JUSTICE WHITE I can, at most, do no more than concur in the judgment. As the Fourth Amendment now has been interpreted by the Court it seems that the Immigration and Naturalization Service is powerless to stop the tide of illegal aliens—and dangerous drugs—that daily and freely crosses our 2,000-mile southern boundary.[1] Perhaps these decisions will be seen in perspective as but another example of a society seemingly impotent to deal with massive lawlessness. In that sense history may view us as prisoners of our own traditional and appropriate concern for individual rights, unable—or unwilling—to apply the concept of reasonableness explicit in the Fourth Amendment in order to develop a rational accommodation between those rights and the literal safety of the country.

---

*[This opinion applies also to No. 74-114, *United States* v. *Brignoni-Ponce, ante,* p. 873.]

[1] The Court today recognizes that as many as 12 million illegal aliens are now present in this country. *United States* v. *Brignoni-Ponce, ante,* at 878, and n. 4. See also U. S. News & World Report, July 22, 1974, p. 27; *id.,* Dec. 9, 1974, p. 77. By all indications the problem will increase in the future, not abate. *United States* v. *Baca,* 368 F. Supp. 398, 402-403 (SD Cal. 1973). In the *Baca* case Judge Turrentine conducted a thorough review of the entire problem and the present Government response. Appended to this opinion is an excerpt from Judge Turrentine's *Baca* opinion describing the illegal alien problem and the law enforcement response.

Given today's decisions it would appear that, absent legislative action, nothing less than a massive force of guards could adequately protect our southern border.[2] To establish hundreds of checkpoints with enlarged border forces so as to stop literally every car and pedestrian at every border checkpoint, however, would doubtless impede the flow of commerce and travel between this country and Mexico. Moreover, it is uncertain whether stringent penalties for employment of illegal aliens, and rigid requirements for proof of legal entry before employment, would help solve the problems, but those remedies have not been tried.

I would hope that when we next deal with this problem we give greater weight to the reality that the Fourth Amendment prohibits only *"unreasonable* searches and seizures" and to the frequent admonition that reasonableness must take into account all the circumstances and balance the rights of the individual with the needs of society. See, *e. g., Terry* v. *Ohio,* 392 U. S. 1 (1968); *Elkins* v. *United States,* 364 U. S. 206 (1960); *United States* v. *Biswell,* 406 U. S. 311 (1972).

## APPENDIX TO OPINION OF BURGER, C. J., CONCURRING IN THE JUDGMENT

Excerpt from Judge Turrentine's opinion in *United States* v. *Baca,* 368 F. Supp. 398, 402–408 (SD Cal. 1973)

### THE ILLEGAL ALIEN PROBLEM

The United States through legislative action has determined that it is in the best interest of the nation to limit the number of persons who can legally immigrate into the country in any given year. These controls

---

[2] For example, testimony in the *Baca* hearings revealed that a complement of 21,000 officers would be needed to control adequately the 75 miles of border in the El Centro sector alone.

reflect in part a Congressional intent to protect the American labor market from an influx of foreign labor. Karnuth v. United States, 279 U. S. 231 ... (1929); § 201 (a) of the Immigration and Nationality Act of 1952, 66 Stat. 163, as amended by the Act of October 3, 1965, 79 Stat. 911, 8 U. S. C. § 1151 (a).

Under this policy of limited admission, 385,685 new immigrants entered the United States legally during fiscal year 1972. Since July 1, 1968, the law has established an annual quota of 120,000 persons for the independent countries of the Western Hemisphere. Included within this quota are immigrants from the Republic of Mexico who in fiscal year 1972 totalled 64,040. 1972 Annual Report, Immigration and Naturalization Service, p. 2, 28.

Currently illegal aliens are in residence within the United States in numbers which, while not susceptible of exact measurement, are estimated to be in the vicinity of 800,000 to over one million. Department of Justice, Special Study Group on Illegal Immigrants from Mexico, A Program for Effective And Humane Action on Illegal Mexican Immigrants, 6 (1973), [hereinafter cited as *Cramton Rpt.*].

Of these illegal aliens, approximately 85 percent are citizens of Mexico. *Cramton Rpt.* at 6. They are industrious, proud and hard-working people who enter this country for the purpose of earning wages, accumulating savings, and returning or sending their savings home to Mexico.

Since 1970, the number of illegal Mexican aliens in the United States who have been apprehended has been growing at a rate in excess of 20 percent per year. *Cramton Rpt.* at 6.

The increasingly large numbers of Mexican nationals seeking to illegally enter this country reflects the sub-

stantial unemployment and underemployment in Mexico—fueled by one of the highest birth rates in the world. Moreover, Mexican employment statistics are not likely to improve dramatically since fully 45 percent of Mexico's population is under 15 years of age and, therefore, will soon be attempting to enter the labor market.

Further prompting Mexican nationals to seek employment in the United States is the fact that there is a significant disparity in wage rates between this country and Mexico. In Mexicali and Tijuana, both Mexican cities bordering the Southern District and each with a population in excess of 400,000, the average daily wage is about $3.40 per day. The minimum wage is even lower for workers in the interior of Mexico. The average worker in Mexico, assuming he can find work, earns in a day as much as he can make in only a few hours in the United States.

In addition, it is estimated that the per capita income of the poorest 40 percent of the Mexican population, the strata most likely to leave their homeland in search of employment in the United States, is less than $150 per year.

The manpower needs of the United States generated by World War II resulted in many Mexicans being imported into this country and becoming familiar with employment opportunities and practices in the United States. See Diaz v. Kay-Dix Ranch, 9 Cal. App. 3d 588, 88 Cal. Rptr. 443 (1970).

The opportunities available to Mexican aliens have traditionally been in agriculture. While still true in many parts of the United States Southwest, in recent years the pattern has changed and more and more illegal aliens are obtaining employment in the service and manufacturing sectors of our economy. These aliens are increasingly found in virtually all regions of the country

and in all segments of the economy. State Social Welfare Board, Issue: Aliens in California, 12 (1973) [Hereinafter cited as *Aliens in California*].

The nature of the change in employment opportunities available is demonstrated by one estimate that 250,000 illegal aliens are employed in Los Angeles County where agricultural opportunities are known to be limited. Hearings on Illegal Aliens Before Subcom. No. 1 of the House Comm. on the Judiciary, 92d Cong., 1st Sess., pt. 1, at 208 (1971) [Hereinafter cited as *Hearings on Illegal Aliens*].

Other estimates of the impact of illegal aliens in California suggest that in 1971, when 595,000 Californians were unemployed (7.4 percent of the State's labor force), there were between 200,000 and 300,000 illegal aliens employed in California earning approximately $100 million in wages. *Hearings on Illegal Aliens* at 150.

Since the majority of Mexicans are unskilled or low skilled workers they tend to compete with Mexican-Americans, blacks, Indians, and other minority groups who, due to the declining percentage of jobs requiring low or no skills, are finding it increasingly difficult to obtain gainful employment. *Cramton Rpt.* at 12.

Illegal aliens compete for jobs with persons legally residing in the United States who are unskilled and uneducated and who form that very group which our society is trying to provide with a fair share of America's prosperity.

In addition, illegal aliens tend to perpetuate poor economic conditions by frustrating unionization, especially in such occupations as farm work.

Illegal aliens pose a potential health hazard to the community since many seek work as nursemaids, food handlers, cooks, housekeepers, waiters, dishwashers, and grocery workers. Immigration and medical officials in

Los Angeles, for example, have discovered that the illegal alien population in Los Angeles' barrio is infected with a high incidence of typhoid, dysentery, tuberculosis, tapeworms, venereal disease and hepatitis. *L. A. Times,* Sept. 16, 1973, pt. II, at 1.

In some states illegal aliens abuse public assistance programs. In some instances entire families who entered the country illegally have been admitted to the welfare rolls. *Aliens in California* at 35, 43.

Another aspect of the problem created by illegal aliens is that employed aliens tend to send a substantial portion of their earnings to relatives or friends in Mexico. This outflow of United States dollars exacerbates our balance of payments problem to the extent of $1 billion a year. *Hearings on Illegal Aliens,* pt. 3 at 683.

The net effect of this silent invasion of illegal aliens from Mexico is suffering by the aliens who are frequently victims of extortion, violence and sharp practices, displacement of American citizens and legally residing aliens from the labor market, and irritation between two neighboring countries.

### THE LAW ENFORCEMENT PROBLEM

Given that illegal aliens are a significant problem in American life, especially for those minority groups who are described as economically deprived, and that Congress has decreed that all but a relatively few aliens are to be permanently excluded, then we must analyze what law enforcement problems exist. In this regard, the following findings of fact are made:

The illegal alien problem is one found primarily in the Southwestern Region of the United States.

This problem along the Mexican-American border has existed for some time with the original responsibility for securing the integrity of the border being assigned to

the U. S. Army, along with the Departments of Treasury and Labor, who had about 20,000 men assigned to the border between Brownsville, Texas, and San Diego, California, in 1920. National Geographic Magazine, "Along Our Side of the Mexican Border." (July 1920).

Currently the burden of controlling the entry of aliens and stemming the flow of illegal aliens along the Mexican-American border is assigned to the INS.[1]

The border extends for almost 2,000 miles from the Gulf of Mexico to the Pacific Coast.

Along this border there were over 152 million legal entries at authorized ports of entry during fiscal 1972, of which over 91 million were made by aliens. Over 39 million of the legal entries were made at the three ports of entry in Southern California (Calexico, San Ysidro and Tecate) of which over 24 million were made by aliens. Immigration and Naturalization Service, 1972 Annual Report, 25.

Of these entries made by aliens, the large portion were made by visitors with official permission to enter the country who had been issued temporary "border passes" such as I–186 cards (issued to residents of Mexico), which authorize the holder to travel within an area no further than 25 miles from the border and for a period of time not to exceed 72 hours. See 8 C. F. R. § 212.6.

These temporary border passes (I–186) are issued to simplify procedures needed for entry, and the issuing process recognizes the inter-relationship of contiguous communities along both sides of the border. *Hearings on Illegal Aliens*, pt. 1, 192.

In fiscal 1973 approximately 208,000 I–186 cards were issued and it is estimated that over two million such

---

[1] The notation "INS" when used herein has reference to the Immigration and Naturalization Service.

cards are currently in circulation. *Hearings on Illegal Aliens,* pt. 1, 173.

Within the INS, the U. S. Border Patrol, which was first established in 1924, has the primary function of preventing the illegal entry of aliens and the apprehension of those who have entered illegally and those who smuggle these illegal entrants.

The Border Patrol has approximately 1,700 agents, who are well-trained law enforcement officers, and of these about 80 percent are assigned along our southern border with Mexico.

A "deportable alien" is a person who has been found to be deportable by an immigration judge, or who admits his deportability upon questioning by official agents.

The number of deportable aliens apprehended by the Border Patrol (which makes the great majority of apprehensions) nationally has grown from 38,861 during fiscal 1963 to 498,123 in fiscal 1973; of this number 128,889 were found by Border Patrol agents working in the Chula Vista sector which includes 70 miles of the border in San Diego County, and 23,125 were located by agents in the El Centro sector which includes the Imperial County of California and 75 miles of the Mexican-American border.

The Border Patrol agents have the power to apprehend illegal aliens since by regulation the Attorney General has designated Border Patrol agents to be immigration officers and authorized them to exercise powers and duties as such officers [8 C. F. R. § 103.1 (i)]; immigration officers by statute § 101 (a)(17) of the Immigration and Nationality Act of 1952, 66 Stat. 163; as amended by the Act of October 3, 1973, 79 Stat. 911, 8 U. S. C. § 1101 (a)(17), are empowered, without a warrant, to stop and interrogate any alien or person believed to be an alien as to his right to remain or to be in the United

States. See Au Yi Lau v. I. N. S., 144 U. S. App. D. C. 147, 445 F. 2d 217 (1971), cert. denied, 404 U. S. 864 . . . .

Sec. 287 (a)(3) of the 1952 Immigration Act provides authority for an immigration officer within a reasonable distance from the border of the United States to board and search any conveyance or vehicle; "reasonable distance" as used in that section of the Act means within 100 air miles from any external boundary of the United States, 8 C. F. R. § 287.1 (b).

Immigration officers also are authorized to conduct inspection of aliens seeking admission or readmission to, or the privilege of passing through, the United States, and also are authorized and empowered to board and search any vehicle or like conveyance in which they believe aliens are being brought into the United States. Sec. 235 (a) of the 1952 Immigration Act, 8 U. S. C. § 1225 (a).

The deployment of Border Patrol agents along the border is intended to maximize the effectiveness of the limited number of personnel, with the first line of defense being called the "line watch." The line watch consists of agents being placed immediately upon the physical boundary where experience has shown that large numbers of illegal aliens can be detected attempting entry. A large number of agents so assigned are primarily concerned with responding to sensor alarms (electronic detection equipment) which are located at strategic positions. These agents also respond to citizen complaints concerning the suspected presence of deportable aliens.

In fiscal 1973, there were 175,511 deportable aliens apprehended throughout the nation by agents assigned to the line watch, with 69,147 being apprehended in the Chula Vista sector and 5,908 in the El Centro sector.

While the Border Patrol would like to apprehend all

deportable aliens right on the border by agents on the line watch, inspections at regular points of entry are not infallible and illegal crossings at other than legal ports of entry are numerous and recurring. The maintenance of continuous patrol over the vast stretches of the border in Southern California is physically impossible, since the approximately 145 miles of boundary creates geographic barriers to effective patrol and man-made devices such as fences and electronic devices are in large part ineffective.

Increased manpower on line watch would not make that activity appreciably more effective as was demonstrated in 1969 during "Operation Intercept" when many more agents were stationed immediately on the border, and yet, the number of illegal aliens apprehended by agents operating inland was not significantly different from like periods when such additional manpower was not located at the boundary.

Once the aliens negotiate their way through the port of entry or, as is most common, walk across the border at a place other than an official port of entry, they find transportation inland either in public conveyances, or private vehicles with increasing numbers being transported by professional smugglers. A few have been known to walk some distance inland and have been apprehended after having walked as far north as Julian, California, which is over 60 miles from the border.

After crossing the line watch some illegal aliens seek employment in the Southern District, but the vast majority attempt to proceed to Los Angeles County and points north.

Once the illegal alien gets settled in a big city far away from the border it becomes very difficult to apprehend him, and therefore, the Border Patrol attempts to contain the illegal entrant within this district. *Aliens in*

*California* at 7. With this objective in mind, they have (pursuant to their statutory authority discussed above) established, since at least 1927, strategically located traffic inspection facilities, commonly referred to as checkpoints, on highways and roads, for the purpose of questioning vehicle occupants believed to be aliens, as to their right to be, or to remain, in the United States, and also to search such vehicles for illegal aliens. Immigration and Naturalization Service Border Patrol Handbook 9–1 (1972) [hereinafter cited as *Handbook*].

The primary objective of the checkpoints is to intercept vehicles or conveyances transporting illegal aliens, or nonresident aliens admitted with temporary border passing cards (I–186), with particular attention being paid to vehicles operated by smugglers or transporters destined for inland cities in violation of 8 U. S. C. § 1324.

The selection of the location of a checkpoint is determined by factors relevant to the interdiction or interception of deportable aliens who have succeeded in gaining entry in an unlawful manner or are proceeding beyond the immediate border area in violation of conditions of their admission as border crossers, 8 C. F. R. § 212.60. The primary factors in selecting a checkpoint site are:

1. A location on a highway just beyond the confluence of two or more roads from the border, in order to permit the checking of a large volume of traffic with a minimum number of officers. This also avoids the inconvenience of repeated checking of commuter or urban traffic which would occur if the sites were operated on the network of roads leading from and through the more populated areas near the border.

2. Terrain and topography that restrict passage of vehicles around the checkpoint, such as mountains, desert, and, as in the case of the San Clemente checkpoint, the Camp Pendleton Marine Base.

3. Safety factors: an unobstructed view of oncoming traffic, to provide a safe distance for slowing and stopping; parking space off the highway; power source to illuminate control signs and inspection area, and bypass capability for vehicles *not* requiring examination.

4. Due to the travel restrictions of the I–186 non-resident border crosser to an area 25 miles from the border (unless issued additional documentation) the checkpoints, as a general rule, are located at a point beyond the 25 mile zone in order to control the unlawful movement inland of such visitors.

Strategic sites that meet the foregoing enumerated criteria are selected for "permanent checkpoints." These are sites equipped to handle a large volume of traffic on what would be a 24-hour basis except in case of manpower shortage, poor weather, or where traffic becomes excessive causing a potential safety hazard. *Handbook* at 9–3.

Other traffic checkpoints, known as "temporary checkpoints" are maintained on roads where traffic is less frequent. The placement of these sites will be governed by the same safety factors as involved in permanent site placement and are usually located where the terrain allows an element of surprise. Operations at these temporary checkpoints are set up at irregular intervals and intermittently so as to confuse the potential violator. *Handbook* at 9–3.

When the checkpoints, whether permanent or temporary, are in operation, an officer standing at the "point" in full dress uniform on the highway will view the decelerating oncoming vehicles and their passengers, and will visually determine whether he has reason to believe the occupants of the vehicle are aliens (i. e., "breaks the pattern" of usual traffic). If so, the vehicle will be stopped (if the traffic at the checkpoint is heavy, as at

the San Clemente checkpoint, the vehicle will be actually directed off the highway) for inquiries to be made by the agent. If the agent does not have reason to believe that the vehicle approaching the checkpoint is carrying aliens, he may exchange salutations, or merely wave the vehicle through the checkpoint.

If, after questioning the occupants, the agent then believes that illegal aliens may be secreted in the vehicle (because of a break in the "pattern" indicating the possibility of smuggling) he will inspect the vehicle by giving a cursory visual inspection of those areas of the vehicle not visible from the outside (i. e. trunk, interior portion of camper, etc.).

At the point of location of the sites now in regular use few aliens have reached the locale on foot, with 99 percent having entered a vehicle of one type or another. Approximately 12 percent of all apprehensions of deportable aliens throughout the nation are made at checkpoints.

In the United States, during fiscal 1973, approximately 55,300 deportable aliens were apprehended by Border Patrol agents working traffic checking operations. In the Chula Vista sector the number for that period was 21,232, while in the El Centro sector the total was 3,825.[2] During fiscal 1973, a total of 4,975 of the above were visitors apprehended at the checkpoints and a majority of these were those who were in violation of the terms of temporary border passes (Form I-186).

The placement of the checkpoints and their operations are coordinated between the two sectors located in this

---

[2] Apparently apprehensions other than those actually made at the checkpoint are included in these figures, but they are a representation of the total activity at these checkpoints and the majority of apprehensions included therein are made at the checkpoints [R. T. 274, 396].

district and with Border Patrol activities to the east in Arizona. In actual operation the checkpoints, be they "permanent" or "temporary," have the same basic accouterments. Typically, about one-half mile to one mile south of the checkpoint is the first notification that the checkpoint is ahead. The notice is in the form of a black on yellow sign indicated "STOP AHEAD" which has floodlights for nighttime illumination, *Handbook* at 9–9. Next, about 200 yards from the checkpoint is another sign cautioning the traffic to slow down or to be careful; this sign usually has flashing yellow lights attached. For the fifty yards directly south of the checkpoint there are placed traffic cones evenly spaced along each side of the highway. The actual checkpoint has a sign indicating to the traffic to stop, with official Border Patrol vehicles parked on each side of the stop zone showing the official Border Patrol emblem and/or the designation U. S. OFFICERS. At this point the agents assigned at the "point," in their official uniform, conduct checking and inspection operations. Beyond the checkpoint is usually a sign indicating "THANK YOU."

While a large number of apprehensions are made at the checkpoints each year, as related above, the primary reason for their operation is that they effectively deter large numbers of aliens from illegally entering the country or violating the terms of any temporary crossing card they may have, because they form an effective obstacle and are located on all major routes north out of the border region.

The deterrence aspect of these traffic checkpoint operations is amply demonstrated by the fact that the illegal alien has to resort to the employment of professional smugglers to provide transportation around or through these checkpoints.

Some of these smuggling operations have developed

into sophisticated and involved operations with the following general *modus operandi*:

1. Contact is made between the smuggler and the alien prior to the latter's leaving Mexico.

2. The aliens then make entry on foot, with possibly the aid of a "guide," or by use of temporary border passes. Then they enter vehicles approximately 2 or 20 miles inland after having passed through the Border Patrol's line watch activities.

3. To get through the traffic checkpoint they might use a "drop house," which acts as a staging area to keep the aliens awaiting inclement weather, or any event that might cause the checkpoint to close down temporarily. Or, they may use a "decoy" vehicle, which is a vehicle loaded with illegal aliens which it is anticipated will be stopped at the checkpoint and would therefore occupy the agents so that other vehicles could pass through without inspection. They even use "scout cars" to probe those roads where temporary checkpoints are maintained, so as to advise other vehicles whether it is safe to proceed.

4. The "load" vehicles themselves can be of any type of conveyance and the methods used to secrete aliens inside them are varied and often show some originality. Unfortunately, sometimes these are very dangerous to the aliens themselves. It has been reported, for example, that it is not at all unusual for an alien to die from asphyxiation while concealed in an automobile trunk or a tank car.

5. The cost of the transportation provided to the aliens is approximately $225 to $250 for each alien for the trip through the checkpoint on to the Los Angeles area. Since smuggling operations are almost exclusively "cash and carry" businesses and the average income among Mexican nationals who may wish to seek resi-

dence here illegally is quite small, this cost tends to act as a very significant deterrent in and of itself. The checkpoints are the major reason for such a high price and if they were discontinued for any length of time it would be one more encouragement to illegal immigration.

The deterrent impact of these checkpoints has been noted on several occasions when they resumed operation unexpectedly and a great number of aliens were apprehended.

The evidence presented before this court clearly established that there is no reasonable or effective alternative method of detection and apprehension available to the Border Patrol in the absence of the checkpoints, for even a geometric increase in its personnel or line watch would not leave any control over those admitted as temporary visitors from Mexico.

Of the approximately half million illegal aliens apprehended in fiscal 1973, virtually none were prosecuted, unless they presented counterfeit or altered documents or aided in smuggling endeavors.

This district has only 3 percent of the total length of land borders, and yet fully 30 percent of all apprehensions of deportable aliens made in the United States are made within this district.

MR. JUSTICE WHITE, with whom MR. JUSTICE BLACKMUN joins, concurring in the judgment.*

Given *Almeida-Sanchez v. United States*, 413 U. S. 266 (1973), with which I disagreed but which is now authoritative, the results reached in these cases were largely foreordained. The Court purports to leave the question open, but it seems to me, my Brother REHNQUIST

---

*[This opinion applies also to No. 74–114, *United States* v. *Brignoni-Ponce, ante*, p. 873.]

notwithstanding, that under the Court's opinions check-point investigative stops, without search, will be difficult to justify under the Fourth Amendment absent probable cause or reasonable suspicion. In any event, the Court has thus dismantled major parts of the apparatus by which the Nation has attempted to intercept millions of aliens who enter and remain illegally in this country.

The entire system, however, has been notably unsuccessful in deterring or stemming this heavy flow; and its costs, including added burdens on the courts, have been substantial. Perhaps the Judiciary should not strain to accommodate the requirements of the Fourth Amendment to the needs of a system which at best can demonstrate only minimal effectiveness as long as it is lawful for business firms and others to employ aliens who are illegally in the country. This problem, which ordinary law enforcement has not been able to solve, essentially poses questions of national policy and is chiefly the business of Congress and the Executive Branch rather than the courts.

I concur in the judgment in these two cases.