UNITED STATES of America

v.

**Juan Antonio PONCE, Mario Martinez, Simon Martinez, Rafael Jaquez, Defendants.**

No. 79 Cr. 921 (LPG).

United States District Court, S. D. New York.

March 3, 1980.

Walter P. Loughlin, Asst. U. S. Atty., S.D.N.Y., New York City, for plaintiff.

Norman J. Mordkofsky, New York City, for defendant Mario Martinez; David J. Goldstein, New York City, of counsel.

## MEMORANDUM DECISION

GAGLIARDI, District Judge.

Defendants Juan Antonio Ponce, Mario Martinez, Rafael Jaquez and Simon Martinez were indicted for conspiracy to violate 18 U.S.C. §§ 2314, 2315 and for concealing and transporting stolen property in violation of the same statutory sections. Defendant Mario Martinez moves, pursuant to Rule 12, Fed.R.Crim.P., to suppress all the evidence seized from him and from 528 Bryant Avenue, Bronx, New York at the time of his arrest on November 21, 1979. An evidentiary hearing was held on this motion on February 19, 1980. For the reasons set forth below, the motion is denied.

### Statement of Facts

The following factual recitation is drawn from the testimony of Stephen Gilkerson, who was the sole witness at the hearing and whose testimony is fully credited by this court. Gilkerson was the FBI agent handling the investigation which led to the arrest of the four defendants. An FBI employee in the Bureau's New Rochelle, New York office, Gilkerson has been involved in the investigation of hijackings and the theft of property from interstate commerce for approximately ten years (Tr. at 10–11). In August 1979, Gilkerson received a teletype from the FBI's Newark office which stated that an employee of the WTC Air Freight Co. ("WTC") had received an anonymous phone call advising him that the contents of a trailer hijacked from WTC was being stored at 528 Bryant Avenue ("the premises") (*Id.* at 12). Based upon this information, Gilkerson drove past the location on several occasions to conduct "spot checks." Although the door of the warehouse at 528 Bryant Avenue was open on one occasion, Gilkerson was unable to see any merchandise inside (*Id.* at 14).

Gilkerson then took steps to determine the owner(s) or occupant(s) of the premises. Jerry Langer, the building's real estate agent, told Gilkerson that an individual identifying himself as Tony Ramirez and another person identifying himself as Ramirez's brother had rented the premises in May 1979. Langer furnished Gilkerson with the address and telephone number which the lessees had given to Langer in the event that Langer had to contact them. Gilkerson's trip to the contact address—320 Audubon Avenue—revealed that there was no such address (*Id.* at 42).

In late October, FBI agent Robert Debellis told Gilkerson that he had information to the effect that there might be stolen light bulbs on the premises (*Id.* at 16). Gilkerson placed the location under surveillance, but agents were still unable to see any cartons or merchandise inside (*Id.*). On October 29th, the agents conducting the surveillance reported to Gilkerson that they observed a blue van, New York license plate 703 MXH, enter and later exit the premises. The agents followed the van as it travelled to several hardware stores in the Bronx (*Id.* at 17).

On November 15th, agent Bill Hutton, one of the agents who had seen the blue van on October 29th, was driving with Gilkerson in the vicinity of Jerome Avenue and Interstate 95 when he spotted the van again (*Id.* at 17–18). The agents followed the van as it travelled to 528 Bryant Avenue. After a brief stop, the van left the premises and the agents followed it first to a hardware store on Westchester Avenue in the Bronx and then to a municipal parking lot in the vicinity of 35th Street and 9th Avenue in Manhattan. The van was then parked and the driver and passenger took off on foot. After the two individuals had been away for some time, the agents approached the van to determine whether they could see anything inside. The two individuals returned as the agents were closely surveilling the vehicle. In order to prevent the individuals from becoming suspicious, the agents told them that they were investigating a hit and run accident involving a vehicle very similar to the van (*Id.* at 19). The two individuals identified themselves to the agents as Mario Martinez and Rafael Jaquez (*Id.*).

One week after this incident, on November 21st, Gilkerson received a phone call at approximately 1:00 p. m. from a New York City police officer who had been working with them on the investigation of 528 Bryant Avenue. The officer told Gilkerson that the door to the premises had been "broken out" and that he was able to see a trailer inside the location (*Id.* at 20). Based upon this information as well as the teletype received from the Newark office, Gilkerson believed that 528 Bryant Avenue was being used as a "drop" and that the trailer probably had been stolen recently (*Id.* at 23).

Gilkerson and several other agents arrived in the vicinity of the warehouse at approximately 2:10 p. m. and observed the top of a trailer through an opening in the doorway (*Id.* at 21, 26). The agents then set up a surveillance across the street from the premises. At approximately 2:45 p. m., the blue van pulled up along side of the premises and three individuals got out and went into the warehouse (*Id.* at 21). Gilk-erson testified that he recognized two of the individuals as Mario Martinez and Rafael Jaquez from his meeting with them on November 15th (*Id.* at 27). Gilkerson observed all three of them occasionally leave the warehouse carrying buckets, proceed to fill the buckets with water from a nearby fire hydrant, and then return to the premises (*Id.* at 27). Sometime thereafter, a car driven by an individual later identified as Juan Ponce parked outside the warehouse. Ponce spoke briefly with the occupants and then, accompanied by one of the individuals later identified as Simon Martinez, drove to a nearby hardware store (*Id.* at 28). Two agents followed them and observed them putting cans with handles and a long broom-like object into the car before returning to 528 Bryant Avenue (*Id.* at 29). When this information was reported to Gilkerson, he considered the possibility that the occupants were painting the trailer to disguise it (*Id.* at 29–30).

Soon thereafter, Gilkerson asked his supervisor to contact Agent Debellis to see if Debellis or his source could furnish any information about the trailer. Debellis was able to ascertain that the trailer on the premises had been stolen from Twin Express, a New Jersey trucking company (*Id.* at 31). Having received this information, Gilkerson's supervisor contacted the United States Attorney's office for the Southern District of New York to obtain their recommendation about arresting the occupants without a warrant. The agents received oral authorization at approximately 4:00 p. m. to arrest the occupants. (*Id.* at 32).

Two agents proceeded to arrest Ponce, who was standing outside the premises next to the blue van. The other agents, including Gilkerson, went inside the warehouse through its slightly ajar front door and arrested the other three individuals. Mario Martinez and Rafael Jaquez were standing toward the rear of the trailer and Simon Martinez was standing on the opposite side, painting a portion of the trailer (*Id.* at 34). The agents uncovered a variety of merchandise inside the warehouse including a large quantity of Sylvania lightbulbs and a large

stock of ladies bathrobes with the brand name "J. C. Penny" (*Id.* at 35). Gilkerson then asked Twin Express and the company that had reported a large quantity of lightbulbs stolen to send representatives to the warehouse to verify that the merchandise was stolen from them. All the merchandise was so identified (*Id.* at 39).

### Discussion

■ Two issues are raised by the instant motion: (1) whether the federal law enforcement officers had probable cause to arrest defendant Martinez and (2) whether the Fourth Amendment permits the officers to enter the commercial premises leased to one of the suspects in order to effect a felony arrest for which the officers have statutory authority and probable cause, but no warrant. Because this court answers both of these questions in the affirmative, and because search was incident to a lawful arrest, it denies defendant Martinez's motion to suppress.

■ The facts and circumstances known to Gilkerson when he and his fellow agents arrested the defendants clearly would have warranted a reasonably prudent and cautious police officer in believing that the defendants had committed or were committing a crime. *See United States v. Ortiz,* 422 U.S. 891, 897, 95 S.Ct. 2585, 2589, 45 L.Ed.2d 623 (1975); *United States v. Brignoni-Ponce,* 422 U.S. 873, 885, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975); *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879 (1949). In August 1979, Gilkerson received information that 528 Bryant Avenue was being used as a drop for stolen property and that the lessee of the premises had given the building's real estate agent a false address. In October, Gilkerson learned from Debellis that there might be stolen light bulbs on the premises. In the course of surveilling the warehouse, agents observed on two occasions, first on October 29th and then on

November 15th, a blue van occupied by various defendants arrive at and depart from the premises and travel to several hardware stores in the Bronx. The New York police officer's observation on November 21st of the top of a trailer inside the warehouse was, as the government has characterized it, "the smoking gun." Within in the following approximately 3½ hour period until the arrest, Debellis informed Gilkerson that the trailer stolen from Twin Express was hidden inside the premises and the agents witnessed three of the defendants fill buckets with water from a nearby fire hydrant and observed two of the defendants leave a hardware store carrying cans with handles and a broom-like object. Moreover, based upon his experience in investigating stolen trailers, Gilkerson testified that stolen vehicles are typically taken to buildings, unloaded as quickly as possible, often disguised, and then abandoned. Considering the evidence collectively, *Raffone v. Adams,* 468 F.2d 860, 866 (2d Cir. 1972), and in light of Gilkerson's training and experience, *United States v. Ortiz, supra,* 422 U.S. at 897, 95 S.Ct. at 2589, this court finds that the agents had probable cause to arrest the occupants of the premises including defendant Martinez.

Notwithstanding the existence of probable cause to arrest, defendant argues that his warrantless arrest was unlawful under the teachings of *United States v. Reed,*[1] 572 F.2d 412 (2d Cir. 1978). We disagree. In *Reed,* this Circuit held that a law enforcement official could not lawfully arrest a suspect in his home in the absence of either a warrant or exigent circumstances. *Id.* at 424. Although neither *Reed* nor its progeny involved a situation in which a warrantless arrest based on probable cause occurred in a commercial premises, these cases make it clear that the holding in *Reed* is limited to warrantless arrests in "intrinsically private places" that have been traditionally "afforded the most stringent Fourth Amendment protection" and which rep-

---

1. A month after this court rendered its decision, the Supreme Court found the reasoning of *United States v. Reed, supra,* to be "persuasive and in accord with [its] Fourth Amendment

decisions." *See Payton v. New York,* —— U.S. ——, ——, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

resent "the archetype of privacy protection" —the home. *Id.* at 424. *See also United States v. Mespoulede*, 597 F.2d 329, 331 (2d Cir. 1979); *United States v. Corcione*, 592 F.2d 111, 118 (2d Cir. 1979); *United States v. Manafzadeh*, 592 F.2d 81, 93 (2d Cir. 1979); *United States v. Hammond*, 585 F.2d 26, 29 (2d Cir. 1978). We therefore decline to extend *Reed* to the facts of this case.

Even assuming for the sake of argument the applicability of *Reed*, the government has met its burden of establishing that exigent circumstances existed to justify the warrantless arrest. The crime was a relatively serious one, the agents were able to enter the premises peacefully and, as previously described, there was a "clear showing" of probable cause that the suspects had stolen the trailer. Moreover, time appeared to be of the essence given the *modus operandi* of the crime—to unload the trailer, disguise it, and abandon it as soon as possible. *See generally United States v. Campbell*, 581 F.2d 22, 25–27 (2d Cir. 1978); *United States v. Reed, supra*, at 424–25. In short, the agents had every reason to believe that they were observing a highly volatile situation and thus were not constitutionally required to obtain a warrant. *Compare United States v. Reed, supra*, at 424–25.

Accordingly, defendant Martinez was lawfully arrested and the agents, once lawfully on the premises, were entitled to seize items in plain view, *Coolidge v. New Hampshire*, 403 U.S. 443, 464–73, 91 S.Ct. 2022, 2037–2042, 29 L.Ed.2d 564 (1971), and to conduct a search of his person incident to the arrest. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1963). Defendant Martinez's motion to suppress all the evidence seized at the time of his arrest is therefore denied.

So ordered.