# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 96-4041WAF

_____

Jo Dee Brouhard, Kenneth          *
Nels Doll, Kathleen Field,   *
Ronald Eugene Hollar,            *
Cherri Ann McKay, Twyla          *
Jane Peery, Richard Glen         *
Stover, Richard Edward           *
Wasson, Robert Eugene         *
Williams, Sarah Leah Johnson,    *
Rocky Lee Harmon, Raymond     *
Julius Herron, Ronald Gene    *
Narx, Andrew James Finken,    *
David Eugene Todd,               *
Christian Paul Lane,          *
Michael Ray Potter, and          *
Tamara Gem Peltier,              *
                                 *
              Plaintiffs,        *
                                 *
Jamie Thrash-Rohde,              *
                                 *
        Plaintiff-Appellant,*
                                 *    Appeals from the United States
              v.                 *    District Court for the
                                 *    Western District of Arkansas
Andy Lee, individually and  *
as Sheriff of Benton County,     *
Arkansas; Gunter Lindermeir;     *
Mark Pitts; Mark Unidano;     *
all individually and as          *
Benton County Deputy Sheriffs;*
and the following law         *
enforcement officers, all     *
individually and as Benton    *
County Deputy Sheriffs,          *
Officers John Doe #1-10,         *
                                 *
        Defendants-Appellees.    *

_____

No. 96-4059WAF
_____

Jo Dee Brouhard, Kenneth          *
Nels Doll, Kathleen Field,    *
Ronald Eugene Hollar,             *
Cherri Ann McKay, Twyla           *
Jane Peery, Richard Glen          *
Stover, Richard Edward            *
Wasson, Robert Eugene         *
Williams, Sarah Leah Johnson,     *
Rocky Lee Harmon, Raymond     *
Julius Herron, Ronald Gene    *
Narx, Andrew James Finken,    *
David Eugene Todd,                *
Christian Paul Lane,          *
Michael Ray Potter, and           *
Tamara Gem Peltier,               *
                                  *
     Plaintiffs-Appellants,       *
                                  *
Jamie Thrash-Rohde,               *
                                  *
          Plaintiff,          *
                                  *
          v.                  *
                                  *
Andy Lee, individually and  *
as Sheriff of Benton County,      *
Arkansas; Gunter Lindermeir;      *
Mark Pitts; Mark Unidano;     *
all individually and as           *
Benton County Deputy Sheriffs;*
and the following law         *
enforcement officers, all     *
individually and as Benton    *
County Deputy Sheriffs,           *
Officers John Doe #1-10,          *
                                  *
     Defendants-Appellees.    *
                             _____

                          Submitted: May 19, 1997

                          Filed: September 23, 1997
                             _____

2

Before MURPHY and HEANEY, Circuit Judges, and ROSENBAUM,[1] District Judge.

ROSENBAUM, District Judge.

Nineteen motorists, who were arrested at "sobriety checkpoints" operated by the Benton County, Arkansas, Sheriff's Department, bring this appeal. All were charged with driving while intoxicated ("DWI") during the operation of these checkpoints.

The appellants ("Motorists") assert claims under 42 U.S.C. § 1983. They claim appellees, the Benton County Sheriff and his deputies, violated their rights by establishing and operating the checkpoints. Specifically, the Motorists claim they were subjected to unconstitutional seizures, in violation of the Fourth Amendment. The parties filed a joint stipulation of facts in the district court,[2] and each party moved for summary judgment. Defendants were granted summary judgment, and the Motorists appealed. We affirm.

I.

In 1994, 192 alcohol or drug related traffic accidents occurred in Benton County, Arkansas, resulting in 5 deaths and 100 injuries. In response to this situation, Andy Lee, Sheriff of Benton County, assigned deputies Gunter Lindermeier, Mark Pitts, and Mark Undiano to the "Benton County DWI Task Force." Deputy Pitts was appointed acting sergeant and supervisor. On June 30,

---

[1]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota, sitting by designation.

[2]The Honorable H. Franklin Waters, Chief Judge, Western District of Arkansas.

1995, the Task Force began operating sobriety checkpoints to detect and deter drunk drivers.  The Sheriff's department publicized its checkpoint program throughout the county.

Sheriff Lee established guidelines governing checkpoint operation. Under the guidelines, the Sheriff's Department was to consult with the prosecuting attorney and local municipal judges before implementing the sobriety checkpoint program.  Checkpoint locations were to be selected after considering "alcohol-involved accident experience" and "law enforcement resource availability."  The checkpoints were to be commanded by a deputy of sergeant rank or a commissioned officer.  Every car was to be stopped.  During a stop, a deputy was to approach the driver, state he was at a sobriety checkpoint, and look for "articulable signs of intoxication."  If "articulable signs" were present, the driver would be directed to an out-of-traffic location for further investigation, including a request for a driver's license.  If the deputies observed no signs of intoxication, they were to explain the program and release the motorist. The guidelines did not prescribe the questions the officers would ask the motorists.

The DWI Task Force selected nine checkpoint sites, each having a history of alcohol-related accidents and frequent DWI arrests.  Sheriff Lee approved each location.  Each site was used more than once.  No officer or motorist was injured at any checkpoint location, nor did any accident occur during checkpoint operation.

Although Sheriff Lee appointed Deputy Pitts acting sergeant, Pitts did not receive a regular sergeant's pay, and at times, Pitts delegated checkpoint command to Deputy Lindermeier who, in turn, occasionally delegated command authority to another deputy.

4

No fewer than eight, and as many as twelve, officers manned each checkpoint. The officers wore reflective vests and deputy sheriff's clothing. Three or more clearly marked police cars, with blue flashing lights, were stationed at each checkpoint. Some police cars were marked "DWI Enforcement Division" in large reflective letters. Vehicles were guided to the checkpoints by orange traffic cones and orange flags and flares. After August 3, 1995, officers used large reflective signs warning motorists to slow down as they approached the checkpoints. On average, checkpoint stops lasted thirty seconds or less. As one officer greeted the motorist, another conducted a quick visual safety inspection.

Sheriff Lee permitted checkpoint officers to request a driver's license at their own discretion. The Task Force guidelines permitted a request for a driver's license as part of the standard initial contact question sequence. Not all drivers, however, were asked for their license. For example, if Deputy Lindermeier saw no obvious signs of intoxication or safety violations, he only asked for a license if "the individual appear[ed] not right."

 Motorists showing no signs of intoxication were allowed to proceed. If the officers observed signs of intoxication, the motorist was detained for a more thorough sobriety check. All appellants showed articulable signs of intoxication when stopped, and all were arrested.

The officers occasionally encountered some drivers who appeared to have been affected by alcohol, but who did not exceed the blood alcohol intoxication limit. In these cases, a checkpoint officer could detain the driver for "intoxication liability" if it

was felt the driver presented a danger to himself or others. Forty-one such drivers were detained between July 1 and September 30, 1995. None of the appellants were among them.

Approximately one checkpoint was set up each week between July and December, 1995. During this period, Benton County experienced a 19 percent overall traffic accident reduction, and an 80 percent reduction in alcohol-related accidents, compared to the same period in 1994. Approximately 2.6 percent of the drivers stopped at checkpoints between July 1, 1995, and November 1, 1995, were arrested for DWI.

The appellants were arrested for DWI at or near Benton County sobriety checkpoints.[3] On November 1, 1995, while awaiting trial, eighteen of the appellants brought suits against Sheriff Lee, the DWI Task Force, and the officers who staffed the checkpoints, alleging Fourth Amendment violations, as protected by 42 U.S.C. § 1983.[4] In particular, appellants claim the checkpoints were unconstitutional because they were not authorized by state authority, the officers exercised too much authority, and the Sheriff's checkpoint guidelines were too frequently disregarded.

---

[3]Appellant Lane was stopped after he was observed evading a checkpoint. Appellant Thrash-Rhode was joined by order of the district court on April 10, 1996.

[4]After filing suit, appellants Field and Harmon were acquitted at trial. The remaining appellants pled guilty and appealed to the Benton County Circuit Court.

II.

We review the district court's grant of summary judgment <u>de novo</u>. <u>Crawford v. Runyon</u>, 37 F.3d 1338, 1340 (8th Cir. 1994). Summary judgment is appropriate when there are no issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

To succeed in their § 1983 claims, the Motorists must show actions were taken under color of state law, resulting in a deprivation of rights secured by the Constitution or federal law. <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988). An unlawful search and seizure by police, which is part of a custom or practice, is actionable under § 1983. <u>Monroe v. Pape</u>, 365 U.S. 167 (1961) (as modified by <u>Monell v. Dep't of Social Services</u>, 436 U.S. 658 (1978)). All parties agree the Benton County sobriety checkpoint actions were taken under color of state law.

Roadblock stops constitute "seizures" under the Fourth Amendment. <u>See</u> <u>United States v. Martinez-Fuerte</u>, 428 U.S. 553 (1976); <u>see</u> <u>also</u> <u>Michigan Dep't of State Police v. Sitz</u>, 496 U.S. 444 (1990). The question, then, is whether the Benton County checkpoint stops were "unreasonable."

A.

Sobriety checkpoints are reasonable under the Fourth Amendment if, on balance, they maintain a proper equipoise between: (1) the gravity of the public concern; (2) the degree to which the public interest is advanced; and (3) the severity of interference with

7

individual liberty.  See Id. (citing Brown v. Texas, 443 U.S. 47, 51 (1979)).

The initial factor -- the gravity of the public's concern -- is clearly satisfied.  "No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it."  Sitz, 496 U.S. at 451.  The parties' agreed facts, stipulating the carnage caused by Benton County's drunk and impaired drivers, demonstrate the gravity of the public concern.

Under the second factor, we review the checkpoints' effectiveness to determine whether the public interest is advanced. We find the Benton County sobriety checkpoints were effective; more effective, in fact, than those upheld in Sitz.  The Benton County officers arrested 2.6 percent of the drivers passing through their checkpoints for driving under the influence.  The Sitz checkpoints, by contrast, had a 1.6 percent DWI arrest rate.  496 U.S. at 455. We find these checkpoints served the public interest, whether or not the Motorists argue there were better means available. Choices between reasonable law enforcement techniques are properly left to politically accountable officials, not the courts.  Sitz, 496 U.S. at 453-54 (construing Brown, 443 U.S. at 47).

Finally, we find there was minimal interference with individual liberty in these stops.  In reaching this conclusion, we consider both the objective and subjective intrusions inherent in checkpoint stops.  See United States v. Martinez-Fuerte, 428 U.S. 553, 558 (1976).  The objective intrusion includes the stop itself, any police questioning, and the nature of the officer's visual inspection or search.  Id.  The average Benton County checkpoint stop lasted thirty seconds or less.  Questioning was limited and

8

designed to reveal signs of intoxication. Only quick visual safety inspections were performed.

A checkpoint's subjective intrusion lies in the perception that a checkpoint may generate fear or public concern. Id.; see also Sitz, 444 U.S. at 452 ("The fear and surprise to be considered are . . . the fear and surprise engendered in law-abiding motorists by the nature of the stop.")[5] This fear is heightened, if motorists perceive they are being singled out by random, roving, patrol stops. See Martinez-Fuerte, 428 U.S. at 559. The fear is, correspondingly, decreased if the stops are conducted in a "regularized manner," which "both appear[s] to and actually involve[s] less discretionary enforcement activity." Id. When, as here, the approaching motorist can see "visible signs of the officers' authority" and all traffic being stopped, the public is "much less likely to be frightened or annoyed by the intrusion." United States v. Ortiz, 422 U.S. 891, 894-95.

The Motorists complain the officers enjoyed undue discretion in their questioning, but the complaint is insubstantial. No evidence was proffered below suggesting the officers asked questions unrelated to determining whether the drivers were intoxicated.[6] We find no authority, either in the Constitution or

_____

[5]Appellants Hollar, Herron, Field, Narx, Wasson, and Thrash-Rhode testified that they initially thought they were approaching an accident scene. They claim they were "surprised" to discover the police activity was a sobriety checkpoint. This is not the "fear and surprise engendered in law-abiding motorists" with which we are concerned.

[6]We express no opinion as to whether license checks, standing alone, are calculated to determine whether a motorist is intoxicated. There is no record evidence showing any of the Motorists were asked for their license before officers detected articulable signs of intoxication. See Section B, below.

the common law, which demands that an officer be held either to a script or denied the reasonable discretion which is necessary to conduct a series of traffic stops occurring in a free and unstructured world. It is unreasonable to hold the officers to a rigid, scripted, series of questions to be asked when conducting a legal highway safety program.

The Motorists further argue that the lack of specific state-granted authority, empirically determined checkpoint placements, and advance publication of checkpoint locations, renders the checkpoints unreasonable. We disagree.

Although the <u>Sitz</u> checkpoints were authorized by state legislation, that fact was not determinative. While <u>Sitz</u> requires authorization by an elected public authority, it nowhere holds that the public authority must be the state legislature. The Benton County program was authorized by the county's elected sheriff. His election by the citizens of the county fully satisfies the <u>Sitz</u> requirement of a grant of public authority. These checkpoints, with sites selected on the basis of historical arrest and traffic-related experience, chosen after consultation with the Sheriff, and where all motorists were momentarily detained, were reasonable and in accord with the Fourth Amendment.

B.

The Motorists also claim the officers violated their Fourth Amendment rights by subjecting them to questioning and license checks without reasonable cause. In addition, they claim "intoxication liability" detention violates the Fourth Amendment. We decline to reach these issues, however, because none of the Motorists experienced the conditions about which they complain. As

10

such, we find the Motorists lack Article III standing to raise these issues.

Under the Constitution's "cases or controversies" clause, a party must allege a cognizable and redressable injury in order to pursue a lawsuit. Oehrleins v. Hennepin County, 115 F.3d 1372, (8th Cir. 1997) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992)). To establish standing, a party must, at a minimum, have suffered an "injury-in-fact," fairly traceable to the defendant's conduct, which is likely to be redressed by a favorable decision. Lujan, 504 U.S. at 560-61. An "injury-in-fact" is an actual or imminent invasion of a legally protected interest, which is both concrete and particularized to the appellant. Lujan, 504 U.S. at 560.

In this case, each Motorist was detained for driving under the influence, and each tested above the permissible intoxication level. There is no suggestion that they were directed to the sobriety testing area for any reason other than having shown "articulable signs of intoxication." Absent any showing that the Motorists were asked for a license as part of the initial stop or detained without arrest, we find they have not suffered the Constitutionally required "injury-in-fact" for which they seek redress.[7]

The Supreme Court has recently warned courts to "put aside the natural urge to proceed directly to the merits of [an] important dispute and to settle it for the sake of convenience and efficiency." Raines v. Byrd, 117 S.Ct. 2312, 2318 (1997). We heed

---

[7]Appellants also claim the officers violated their privacy rights by permitting television news crews to film at the checkpoints. Absent a showing that any of these appellants were subjected to this behavior, the Motorists lack standing to assert this claim, as well.

11

this sound advice.  Accordingly, we express no opinion as to the propriety of "intoxication liability" detentions or random requests for drivers' licenses during sobriety checkpoint stops.

## C.

The district court declined to address the appellants' Arkansas State law State Constitutional claims.  We agree these claims are more properly considered in the Arkansas state courts.

## III.

The judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT