**Luis A. JANDRO, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 87–252.

Supreme Court of Wyoming.

Oct. 11, 1989.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Karen A. Byrne, Asst. Atty. Gen., Donald M. Gerstein, Legal Intern, for appellee.

Wyoming Public Defender Program: Leonard D. Munker, State Public Defender, Thomas B. Jubin, Asst. State Public Defender, and Mike Cornia, Asst. State Public Defender, for appellant.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

THOMAS, Justice.

The principal question presented in Luis Jandro's appeal relates to the admissibility of statements of co-conspirators in a prosecution for conspiracy to deliver methamphetamine, particularly with respect to the impact upon Jandro's right of confrontation. Other issues which are presented involve whether there was probable cause to arrest Jandro so that money taken from him in a search incidental to his arrest was properly admitted into evidence and whether the failure of the arresting officers to

furnish the information required pursuant to § 7–1–111, W.S.1977 (since repealed), in writing or to otherwise record it, and to obtain the statutorily required form of waiver according to § 7–1–113, W.S.1977, made Jandro's statements to a law enforcement officer inadmissible. The trial court admitted the evidence taken from Jandro pursuant to a search incidental to his arrest; ruled that no error existed with respect to the failure to furnish advice in writing or otherwise record it or to obtain a waiver in writing from Jandro; and admitted the statements of co-conspirators over Jandro's objection. We are satisfied that no reversible error exists, and we affirm Jandro's conviction.

Jandro was convicted of conspiring to deliver methamphetamine, as defined in Schedule II, § 35–7–1016(d)(ii), in violation of §§ 35–7–103(a)(ii) and 35–7–1042, W.S. 1977 (June 1988 Repl.).[1] Following his conviction, after a trial by a jury, Jandro was sentenced to a term of not less than four nor more than six years in the Wyoming State Penitentiary with credit given for 240 days of pre-trial confinement. Jandro has appealed that judgment and sentence.

In his Brief of Appellant, Jandro advises the court of the following issues for review:

"I. There was insufficient probable cause to arrest appellant, and evidence obtained pursuant to that unlawful arrest was erroneously admitted into evidence at trial.

"II. Upon arresting appellant, the law enforcement officers failed to obtain a written or recorded waiver of *Miranda* rights and appellant's subsequent statements should have been suppressed.

"III. It was error to admit the hearsay statements of alleged co-conspirators because the State never made a prima facie showing of conspiracy involving appellant."

The State of Wyoming, as appellee, identifies substantially the same issues, but restates them to be:

"I. Did probable cause for appellant's arrest exist and was evidence obtained pursuant to that arrest properly admitted?

"II. Does failure to obtain a written waiver of Appellant's Miranda rights amount to harmless error?

"III. Did the State make a prima facie showing of a conspiracy involving appellant?"

A summary of the events disclosed by the record, which culminated in the arrest and conviction of Jandro, among others, commences with the furnishing to John Downing of $1,500 in recorded $100 bills by a Casper detective. This money was to pay for an ounce of methamphetamine that Downing had obtained from a Mrs. Noveline Miles. Mrs. Miles was a resident of California and was determined to be one of Jandro's coconspirators. Earlier, Downing had promised Gene Nordgren, another coconspirator, that later, on the same afternoon or evening, he would pay Nordgren for the methamphetamine after he had collected from his "customer." Downing made the promised payment, using the identified bills, and then dropped out of the picture. Nordgren handed the recorded money to Miles and sometime later, around 10:30 P.M., Nordgren and Miles rented a car, picked up Nordgren's brother, Steve,

---

**1.** Section 35–7–1031, W.S.1977 (June 1988 Repl.), provides, in pertinent part, as follows:

"Except as authorized by this act, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance. Any person who violates this subsection with respect to:

\* \* \* \* \* \*

"(ii) Any other controlled substance classified in Schedule I, II or III, is guilty of a crime and upon conviction may be imprisoned for not more than ten (10) years, fined not more than ten thousand dollars ($10,000), or both;
\* \* \*."

Section 35–7–1042, W.S.1977, provides:

"Any person who attempts or conspires to commit any offense under this article within the state of Wyoming or who conspires to commit an act beyond the state of Wyoming which if done in this state would be an offense punishable under this article, shall be punished by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense the commission of which was the object of the attempt or conspiracy."

another known narcotics dealer, and drove to Rawlins. The purpose of that trip was to arrange for the purchase of a fresh supply of controlled substances, including methamphetamine, for resale. They were not aware that the bills which they were carrying were the recorded bills the detective had given to Downing, nor did they know that they were being followed by a surveillance team. This surveillance team had monitored the earlier transaction between the detective and Downing, and the team also had monitored continuously the activities of Nordgren and Miles during the day.

The following morning, January 16, 1987, the two Nordgrens and Miles, still under surveillance, met with an individual named Marco Macias (Marco) at a Rawlins motel where Jandro and Marco were staying. The Casper police and the Wyoming Department of Criminal Investigation (DCI) earlier had obtained information from a previously reliable informant that Marco, a resident of California, had brought methamphetamine into the Casper area on at least one prior occasion. Their belief was that he had done the same thing on other occasions. The reliable informant had told the authorities that Marco and a partner, who was not identified, again were engaged in delivering methamphetamine into Wyoming.

In the motel room in which Marco and Jandro were staying, Gene Nordgren and Marco discussed terms and other arrangements for the purchase of controlled substances. Miles simply watched and listened. Apparently, she was simply to serve as a middleperson or introducer and be an observer, and Gene Nordgren was to do the actual dealing. At the trial, her testimony was that she had gone along on this trip only because she was bored in Casper. Even so, she helped with computations and the determination of prices. She denied any past drug dealings with Marco, but she testified that she had known him from various meetings back in California. Even given her prior acquaintance with Marco, it appears that Steve Nordgren, not Miles, was the primary contact person between Marco and Gene Nordgren.

Marco wanted some "good will" money before he would agree to release any controlled substances. Miles gave the $1,500 in recorded bills to Gene Nordgren who then handed it over to Marco. This was understood to be a short-term loan due later the same day with "interest" amounting to $500. Gene Nordgren added another $150 of his own. This seemed to satisfy Marco who then "fronted" the three, Gene Nordgren, Steve Nordgren, and Miles, with eight ounces of methamphetamine, four ounces of cocaine, and a pound of marijuana. The agreed price was $11,650, so the $1,650 paid at this time really was nothing more than "good will." The balance of $10,000 was to be paid the next day after the three dealers had resold the controlled substances. During these events, except for a brief interlude when he woke up and rubbed his eyes before falling back down on the bed, Jandro was asleep in the room. He did not participate in the conversations or negotiations relating to this transaction.

The two Nordgren brothers and Miles then took their new supply of controlled substances and drove to Riverton where they left Gene Nordgren to dispose of their stock. Gene Nordgren had told the other two that he believed he could sell it all to Mike Etheridge, another known dealer in controlled substances, in one transaction. Steve Nordgren and Miles returned to Casper.

Etheridge, although quite willing to sample the merchandise, was not able to dispose of an amount as large as this, and he and Gene Nordgren decided to drive around the state in an effort to sell it in other locations. While pursuing this plan, Etheridge and Gene Nordgren got involved in a high speed chase between Powder River and Casper at the culmination of which they were arrested. During the latter part of the chase, they jettisoned amounts of marijuana and methamphetamine from the vehicle, together with various other objects, some of which were recovered by the arresting officers. Those officers were members of the same surveillance team that had monitored the Downing transaction in Casper and had then followed the

two Nordgren brothers and Ms. Miles to Rawlins. After he had been arrested, Gene Nordgren agreed to assist the officers in their continuing investigation.

While these other events were transpiring, Marco and Jandro had moved to Douglas where they rented another motel room. During the course of the day, Marco called Miles, who by then was now back in Casper, to inquire about Gene Nordgren and the rest of his money. Both of them were unaware of Gene's arrest. Around 7:00 P.M., Miles, at the suggestion of Marco, went from Casper to Douglas where there was, supposedly, no "heat" (a slang term for police interest). On this journey, Miles was accompanied by her brother, Nick Dennis, and a friend of the brother, Jose Olquin. When they arrived in Douglas, she was not permitted to go directly to the motel room occupied by Jandro and Marco. Instead, she was directed to meet Jandro in a nearby field with the understanding that he then would lead her to the motel room. This was Jandro's first direct contact with Miles. The outdoor meeting occurred as planned, and those two, leaving Dennis and Olquin in the car, proceeded to the motel room where they met with Marco. Miles was without funds, and she asked Marco for the money she had fronted for the controlled substances. Her contention was that she was not responsible for any losses because she was simply a middle-person. Marco refused the request, advising her that Jandro had the money. Miles testified that Jandro exploded at that point, yelling that he "had $30,000 in this and Gene had better come back with his money, that he would break his arms and legs or do whatever he had to do to get his $10,000." She also testified that when Marco asked Jandro to return the money to her, Jandro laughed, waved a wad of money and refused, saying "[T]his is our money now, it is not yours." Jandro did lend Miles $30 for a motel room so that she would not return to Casper that night. She left and rented a room across the street in which she spent the night while awaiting the return of Gene Nordgren and her money.

On the next morning, January 17, 1987, Gene Nordgren, in furtherance of his agreement to cooperate and under electronic surveillance, met Jandro and Marco in their motel room. After leaving, he advised the detectives that only two men, Marco and Marco's partner, were in the room. Marco soon left the room and, after walking around the lobby for a short time, returned. Minutes later, Jandro left and walked to the lobby. He was looking out the front window when he noticed a Douglas police car driving up. He immediately picked up a house phone and started to dial. At this point, one of the DCI investigators who had monitored the original Downing transaction in Casper approached Jandro, identified himself, and proceeded to question him. The investigator first asked Jandro if he was a guest. Jandro said that he was, but balked when he was asked his name and room number. Jandro stated this was private information although he did produce a California driver's license for identification. Then the investigator asked him if he knew someone named Marco, and Jandro denied that acquaintance. Jandro also denied knowing anyone named Noveline or Nordgren.

The investigator, knowing these latter answers were false, then placed Jandro under arrest for conspiracy to deliver a controlled substance. Miles had been arrested a few minutes earlier, and Marco was arrested a few minutes later. The investigator advised Jandro of his constitutional rights and then searched him. He found eleven of the original marked bills in Jandro's shirt pocket. Jandro had agreed to this search, but he had not given a written consent nor had he waived his rights under the constitution in writing. In response to questions by the arresting officer, Jandro first said he had not been in Rawlins but, when advised that the officer knew he had been, Jandro agreed that he had been in Rawlins and had come from California to Wyoming to look at cars. He said he was not a car dealer, but was a car broker and had a couple hundred dollars on his person. After $252 was found in his billfold, he denied having any other money but, upon being searched incidental to his arrest, $1,652 was found in his shirt pocket. He

made no response when asked why he had lied about how much money he had, but then later he said he had brought the money with him from California.

Jandro was interviewed again the next day and discussed some scale weights with the arresting officer. Jandro said that they were his and he had brought them from California. He said they were used in his employment as a hazard waste disposal operator for IBM Company, and he had brought them along in case he had a job interview in Wyoming. He again explained that he had come to Wyoming looking for car deals, and he also advised that the money had been obtained from Marco when they were in Rawlins. He further explained that he rented motel rooms under an alias in case the car deals in which Marco was involved turned out to be illegal. While not incriminating him directly, Jandro's statements, under the circumstances, clearly were less than candid and quite suspicious in some respects.

As the case was wound up, Noveline Miles entered pleas of guilty to two conspiracies to deliver controlled substances. One of those involved Gene Nordgren and arose out of the original sale to Downing in which Jandro was not implicated. The other involved Jandro because of her advance of the $1,500 and the subsequent events. Miles testified to these facts at trial and also to the fact that she had received a reduced sentence in exchange for her pleas of guilty and, one would assume, her cooperation.

Marco Macias was determined to be an alien of Columbian origin. He was deported prior to Jandro's trial and, for that reason, was not available as a witness. At Jandro's trial, statements made by Marco prior to trial were offered and received in evidence.

We address the issues in the order raised by Jandro, a chronological development. Jandro contends that it was error to admit the eleven marked $100 bills found in his shirt pocket because they were the product of a search incidental to an unlawful arrest. He argues that the record does not demonstrate sufficient probable cause to

justify his arrest without a warrant and that the recorded $100 bills should not have been part of the evidence against him. We agree with the trial judge who ruled that this evidence was admissible.

■ There is no question in this case about whether the arresting officer had an arrest warrant or a search warrant at the time the recorded bills were taken from Jandro. He had neither. A warrantless arrest is justified by § 7–2–103, W.S.1977 (Cum.Supp.1986), which provides, in that part here pertinent:

"(a) A peace officer may arrest a person without a warrant and detain him until a legal warrant can be obtained when:

\* \* \* \* \* \*

"(ii) He has reasonable grounds to believe that a felony, as defined by section 6–2 [§ 6–1–102] of the statutes has been committed and he has reasonable grounds for believing that the person to be arrested has committed it; \* \* \*."

We note that the wording of the statute, in effect at the time of Jandro's arrest, refers to "reasonable grounds" instead of the more commonly used phrase "probable cause." However, we discern a legislative intent to equate these two phrases, and we accordingly treat them as interchangeable. *Roose v. State*, 759 P.2d 478 (Wyo.1988); *Neilson v. State*, 599 P.2d 1326 (Wyo.1979), cert. denied, 444 U.S. 1079, 100 S.Ct. 1031, 62 L.Ed.2d 763 (1980). Jandro's arrest was permissible under this statute provided the arresting officer was possessed of sufficient information to constitute probable cause.

This court last visited the concept of search incidental to a lawful arrest in *Roose*. In that case, we quoted the following language from *Neilson*:

" 'A peace officer may arrest a person without a warrant if, at the moment the arrest is made, he has probable cause to believe that a crime had been committed by the person to be arrested, or he has reasonable grounds to believe that a crime is being committed in his presence by the person to be arrested. Stated another way, the determination of proba-

ble cause to arrest without a warrant depends upon whether the facts and circumstances within the peace officer's knowledge and of which he has reasonably trustworthy information were sufficient to warrant a reasonably cautious or prudent man to believe that the person arrested has committed or is committing an offense. The constitutional standard governing probable cause is ,grounded upon reasonableness. Thus, an appellate court's inquiry into whether or not an arrest is legal in a given case is restricted to an objective consideration of the evidence in the record.'" *Roose,* 759 P.2d at 481.

The standard articulated in *Neilson* is consistent with that adopted by the Supreme Court of the *United States in Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 861, 43 L.Ed.2d 54 (1975), in which the court said that probable cause consists of "facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'"

■ This court also has defined probable cause as " 'the facts and circumstances within the *peace officer's knowledge* and of which he had *reasonably trustworthy information* * * * sufficient to warrant a reasonably cautious or prudent man to believe that the person arrested has committed * * * an offense (emphasis added).'" *Ostrowski v. State,* 665 P.2d 471, 476 (Wyo. 1983); *Neilson.* See *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879, reh. denied, 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513 (1949). It is recognized that the standard is an objective one which is not subject to police discretion, *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), but, even so, the matter of probable cause "is to be viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of the arrest guided by his experience and training." *United States v. Davis,* 458 F.2d 819, 821 (D.C.Cir.1972). The experience and expertise possessed by the arresting officer is to be taken into account. *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); *Johnson*

*v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

■ The facts and circumstances which justify a determination that probable cause was present must amount to more than mere suspicion, but they need not rise to the level of proof of guilt, nor even to the level of prima facie evidence of guilt. *Ostrowski; Raigosa v. State,* 562 P.2d 1009 (Wyo.1977); *Brinegar.* The determination of whether the standard was met must be made upon an evaluation of the record. *Ostrowski; Neilson.* In applying the standard, we evaluate the record, with a practical view using good sense. *Vrooman v. State,* 642 P.2d 782 (Wyo.1982).

■ We also recognize that it is not necessary that the arresting officer personally have all of the information about all of the elements which constitute probable cause. He is entitled to rely on the collective knowledge of the other investigating officers. *Williams v. State,* 557 P.2d 135 (Wyo.1976). In this regard, the court adopts the doctrine expressed in *United States v. Stratton,* 453 F.2d 36, 37 (8th Cir.1972), cert. denied, 405 U.S. 1069, 92 S.Ct. 1515, 31 L.Ed.2d 800 (1972), in which the court held:

"We think the knowledge of one officer is the knowledge of all and that in the operation of an investigative or police agency the collective knowledge and the available objective facts are the criteria to be used in assessing probable cause. The arresting officer himself need not possess all of the available information."

In applying this doctrine, the arresting officer should consider and weigh the totality of the circumstances when making a decision as to probable cause. He need not proceed on the basis of only isolated facts or circumstances.

■ In Jandro's case, the record demonstrates that the arresting officer had credible and reliable knowledge of the following facts and circumstances. He was aware that Marco Macias was a methamphetamine supplier from the west coast; that he was reported to have been coming out to Wyoming with a fresh supply of controlled

substances; and that he would be accompanied by a partner who had not been identified at that point. This information was furnished by a previously reliable informant. From personal observation, the arresting officer knew that Jandro was the only individual accompanying Marco. That matched the report of the informant. The arresting officer, by virtue of the team surveillance and communication, knew that Jandro was present in the motel room in Rawlins at the time that Miles and the Nordgren brothers arranged to purchase controlled substances for resale. In addition, he knew that Marco and his partner had moved on to Douglas and that Gene Nordgren was to meet Marco there to pay for the controlled substances Marco had fronted for him and the other co-conspirators. Immediately following Gene Nordgren's meeting with Marco and his partner, the officer knew, not only through the electronic surveillance but through the information furnished by Gene Nordgren, that there were only two men in the motel room, Marco, the known dealer in controlled substances, and Marco's partner. The officer personally observed Jandro leave the room. He also watched Jandro hurrying to use a telephone when he observed a police car arrive at the motel.

Considering the totality of these circumstances, sufficient probable cause was present to justify Jandro's arrest. Given the facts and circumstances available to the arresting officer, any reasonably prudent police officer, especially one with this officer's experience and expertise, would conclude that it was probable that Jandro was involved in a conspiracy to deliver controlled substances. We hold that Jandro's arrest was lawful under the statute and that the search was incidental to the arrest. Such a search is lawful and, indeed, recommended for assuring the safety of the arresting officers and others in the vicinity. It was appropriate to search for, and seize, evidence on Jandro's person in order to prevent its concealment or destruction. Nothing indicates that this search was not routinely accomplished as incidental to the lawful arrest. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561

(1974); *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Roose*, 759 P.2d 478.

We then turn to Jandro's contention that the failure of the law enforcement officers to obtain a written or recorded waiver of his constitutional rights must be applied to void his conviction. In this regard, the state concedes that § 7–1–113, W.S.1977, was not followed. That statute provided:

"A person who has been appropriately informed under W.S. 7–9.21 [§ 7–1–111] may waive in writing, or by other record, any right provided by this act if the court concerned, at the time of or after waiver, finds of record that he has acted with full awareness of his rights and of the consequences of a waiver and if the waiver is otherwise made according to law. The court shall consider such factors as the person's age, education, familiarity with the English language and the complexity of the crime involved."

This waiver provision now is found in § 7–6–107, W.S.1977 (June 1987 Repl.), and the requirement that a waiver be in writing or otherwise recorded no longer is present.

Jandro also points to § 7–1–111, W.S. 1977, which provided in pertinent part:

"(a) If a person who is being detained by a law enforcement officer * * * is not represented by an attorney *under conditions in which a person having his own counsel would be entitled to be so represented,* the law enforcement officers concerned, upon commencement of detention * * * shall clearly inform him of the right of a needy person to be represented by an attorney at public expense, and if the person detained or charged does not have an attorney, notify the * * * trial court concerned * * * that he is not so represented [emphasis added].

\*    \*    \*    \*    \*    \*

"(e) Information given to a person under this section is effective only if:

"(i) It is in writing or otherwise recorded;

"(ii) He records his acknowledgment of receipt and time of receipt, or, if he refuses to make this acknowledgment, the person giving the information records that he gave the information and that the person informed refused so to acknowledge it; and

"(iii) The material so recorded under paragraphs (i) and (ii) of this subsection is filed with the court next concerned."

It is clear these statutory provisions were not followed. It also is clear that the material circumstances did not encompass any requirement that they be followed.

Jandro asserts that the failure to comply with the statute makes the statements that he gave to law enforcement officers inadmissible. It is clear from the record that there was no violation of the rights preserved to Jandro under the Fifth Amendment to the Constitution of the United States as articulated in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966). This court has subscribed to the doctrine of *Miranda* not only under the Fifth Amendment but under Article 1, § 11 of the Constitution of the State of Wyoming. E.g., *Dryden v. State,* 535 P.2d 483 (Wyo.1975). We perceive Jandro's argument, however, as an unwarranted effort to expand upon the legislative intent represented by the statutory enactments upon which he relies. Those statutes are a part of the Public Defender Act and, read in pari materia with other provisions, it is clear that the legislative effort was designed to secure for those needy persons defined in the statute the constitutional right to be represented by counsel as provided by the Sixth Amendment to the United States Constitution and by Article 1, § 10 of the Constitution of the State of Wyoming.

This court has held consistently that the right to counsel attaches only upon the commencement of adversary criminal proceedings. *Best v. State,* 736 P.2d 739 (Wyo.1987); *Charpentier v. State,* 736 P.2d 724 (Wyo.1987); *State v. Heiner,* 683 P.2d 629 (Wyo.1984); *Brown v. State,* 661 P.2d 1024 (Wyo.1983). In this instance, the adversary criminal proceedings had not commenced at the time of Jandro's interrogation by the law enforcement officers. We call particular attention to the language in § 7–1–111, W.S.1977, which provides for pursuing the statute "if a person * * * is not represented by an attorney under conditions in which a person having his own counsel would be entitled to be so represented, * * *." We are cognizant of the language of the statute that refers to a person being detained by a law enforcement officer, and simply point out that detention by a law enforcement officer can occur after the initiation of adversary criminal proceedings. It is clear that Jandro's responses to the law enforcement officers were voluntary in the context of the preservation of his rights under the Fifth Amendment to the Constitution of the United States and Article 1, § 11 of the Constitution of the State of Wyoming. He had been told that he had a right to consult with an attorney and did not insist upon the exercise of that right.

Furthermore, we can discern no impact upon Jandro's right to a fair trial resulting from the failure to comply with the statutes. Jandro must assume the burden of demonstrating the possibility that the verdict of the jury might have been more favorable to him in the absence of even a technical error. *Trujillo v. State,* 750 P.2d 1334 (Wyo.1988); *Jones v. State,* 735 P.2d 699 (Wyo.1987). The responses that Jandro made at the times he was interrogated were not incriminatory. They were evasive and contrary to fact. In the context of the trial, the jury might well have believed that he was lying to the law enforcement officers at the time he made the statements. Nevertheless, in the light of all the other evidence in this case, we can perceive no reasonable possibility that the jury might have decided to find Jandro guilty because he had lied to the law enforcement officers. Obviously, the jury responded to the testimony of the other witnesses which clearly provided direct and circumstantial evidence of Jandro's guilt.

The last question to be resolved is Jandro's claim of error relating to the admis-

sion of out of court statements made by co-conspirators. Jandro concedes that the prosecution established adequate independent proof of the existence of a conspiracy, but he contends that there was a failure to demonstrate his membership in the conspiracy so that statements implicating him, even though made in furtherance of the conspiracy, were hearsay and were admitted in error. In presenting this argument, Jandro urges that we consider the issue, not in the light of our prior cases, but under what he contends are the more stringent federal standards requiring proof of both the existence of a conspiracy and the defendant's participation in it by a preponderance of the evidence, not by a prima facie showing, before the statements of co-conspirators can be admitted. He also urges that, under any standard, there must be sufficient independent proof of this foundation introduced prior to the time the statements can be offered. Jandro also argues that, even if the statements of co-conspirators were properly admitted, the introduction of the statements attributed to Marco violate his right of confrontation under the Sixth Amendment to the United States Constitution and under Article 1, § 10 of the Constitution of the State of Wyoming.

Essentially, Jandro's claim is that, without the requisite foundation, the statements of co-conspirators are simply statements made by an out of court declarant which are hearsay and inadmissible at trial. Rules 801 and 802, W.R.E.; *Kelly v. State*, 694 P.2d 126 (Wyo.1985). With respect to statements of co-conspirators, Rule 801(d)(2)(E), W.R.E., provides as follows:

"(d) *Statements which are not hearsay.* —A statement is not hearsay if:

\* \* \* \* \* \*

"(2) Admission by Party–Opponent.— The statement is offered against a party and is

\* \* \* \* \* \*

"(E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

If the statements which were admitted fit under this rule, they are not hearsay, and

any objection to their admission into evidence based upon Rule 802, W.R.E. (which generally excludes hearsay), was properly overruled.

This rule, now so recurrent in criminal prosecutions, had its origin, and finds its justification, in the laws of agency. Indeed, the statements of co-conspirators often were referred to as vicarious admissions. *Bigelow v. State*, 768 P.2d 558 (Wyo.1989). In *Hitchman Coal & Coke Company v. Mitchell*, 245 U.S. 229, 249, 38 S.Ct. 65, 72, 62 L.Ed. 260 (1917), the court explained:

"\* \* \* The rule of evidence is commonly applied in criminal cases, but is of general operation; indeed, it originated in the law of partnership. It depends upon the principle that when any number of persons associate themselves together in the prosecution of a common plan or enterprise, lawful or unlawful, from the very act of association there arises a kind of partnership, each member being constituted the agent of all, so that the act or declaration of one, in furtherance of the common object, is the act of all, and is admissible as primary and original evidence against them."

■ Three elements must be demonstrated before a statement can be admitted as non hearsay under Rule 801(d)(2)(E), W.R.E. There must be evidence of a conspiracy; evidence that the declarant and the defendant both were involved in the conspiracy; and a showing that the proffered statements were made during the course of, and in furtherance of, the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed 593, reh. denied, 345 U.S. 919, 73 S.Ct. 726, 97 L.Ed. 1352 (1953); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Bigelow; Burke v. State*, 746 P.2d 852 (Wyo.1987). The first two requirements insure that the statements were in fact made by a co-conspirator, and the last introduces a measure of relevance and trustworthiness.

We previously have held that these elements may be demonstrated by prima facie evidence. *Burke; Dorador v. State,* 711 P.2d 417 (Wyo.1985); *Jasch v. State,* 563 P.2d 1327 (Wyo.1977). We concluded that such a showing is adequate, and we required neither a preponderance of the evidence nor proof beyond a reasonable doubt. *Jasch.* In addition, we have recognized that because of the covert nature of the crime of conspiracy, the foundation may be established with circumstantial evidence. *Bigelow; Burke; Jasch.* Whether the standard has been met is a matter that, similar to other rulings as to the admissibility of evidence, is within the proper discretion of the trial court. Rule 104, W.R.E.; *Bourjaily.* Our rule is that we do not disturb evidentiary rulings in the absence of a clear abuse of discretion. The proper exercise of discretion is demonstrated if the record encompasses sufficient evidence to permit the trial court to infer the existence of a conspiracy and the identity of its members.

We conclude that adequate foundation evidence is present in this record. Jandro does not question the sufficiency of the evidence as to the existence of the conspiracy. His dispute is with the sufficiency of the proof of his membership. Miles testified that Jandro was in the room where, and at a time when, the drug transactions took place. That was consistent with the observations of the surveillance team. The record also shows that Jandro met Miles in the field in Douglas and conducted her to the motel room where he was staying with Marco. Jandro was present during her discussion with Marco. He had possession of the marked bills originally given to Downing to purchase methamphetamine. Conceding that the thrust of this evidence is circumstantial only, it is sufficient to sustain an inference of Jandro's membership in the conspiracy for the purpose of introducing the statements of co-conspirators. *Jasch.* It may be true that those facts would not alone suffice to convict Jandro of conspiracy to deliver a controlled substance, because conviction requires proof beyond a reasonable doubt, but we are satisfied that there was sufficient evidence

to permit the trial court, in the exercise of its discretion, to infer the existence of a conspiracy and appellant's membership in it for purposes of making its ruling. See *Bourjaily.* The additional proof of Jandro's guilt then is found in the statements of the co-conspirators.

We recognize that a preferred order of proof may well exist. It is far easier to analyze contentions such as Jandro's when the existence of a conspiracy and membership in it is established before any statements of co-conspirators are offered. Nevertheless, we consistently have held that the order of proof relative to the introduction of the statements is not significant if the record does contain facts from which the conspiracy, and the defendant's membership in it, appropriately may be inferred. Rule 104(b), W.R.E.; *Dorador,* 711 P.2d 417; *Jasch.* While the preferred order of proof should be utilized whenever possible, the failure to do so is not reversible error. See *United States v. DuFriend,* 691 F.2d 948 (10th Cir.1982), cert. denied, 459 U.S. 1173, 103 S.Ct. 820, 74 L.Ed.2d 1017 (1983). Jandro has not demonstrated any compelling reason for us to adjust these rulings.

As we have indicated, our rule requires proof of the first two elements independent of the co-conspirators' statements. See *Bourjaily; Jasch.* We do not permit "bootstrapping." See *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); see also *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Under our rule, the statements of the co-conspirators cannot be considered in determining whether the conspiracy existed or the defendant was a member. *Jasch,* 563 P.2d at 1334; see Annotation, *Necessity and Sufficiency of Independent Evidence of Conspiracy to Allow Admission of Extrajudicial Statements of Coconspirators,* 46 A.L.R.3d 1148 (1972). In this instance, that limitation was not transgressed.

Jandro argues vigorously that Wyoming should embrace the preponderance of the evidence standard articulated in *Bourjaily* in resolving the question of admissibility of

the co-conspirators' statements. In *Bourjaily*, 483 U.S. at 176, 107 S.Ct. at 2779, the United States Supreme Court said, "when the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence." In our judgment, this is not a proper case to resolve this argument. The requirement suggested by the Supreme Court of the United States is viable only in the context of a contest with respect to the foundation. That contest well could be found in a pre-trial motion to suppress. It is even possible that the court could interrupt the trial and conduct a trial within the trial on the question of admissibility. When as here, however, the challenge is made simply by way of objection, the description of the standard becomes only a matter of semantics. In such an instance, the only evidence before the court is that which has been presented by the prosecution. Whether the court invokes a prima facie standard of proof or a preponderance of evidence standard of proof, exactly the same evidence is considered. Consequently, it is not material in our consideration of this case whether the standard invoked by the trial court was a preponderance of the evidence or a prima facie case. So long as the record discloses evidence of a conspiracy and evidence of Jandro's membership in the conspiracy, the requisite foundation has been established.

■■■ With respect to Jandro's claim that he was denied his right, under the Sixth Amendment to the United States Constitution and Article 1, § 10 of the Constitution of the State of Wyoming, to confront witnesses against him, we adopt the rule articulated by the Supreme Court of the United States. While hearsay rules are designed to protect the constitutional guarantee. *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), the out-of-court statements of a co-conspirator are not hearsay. The United States Supreme Court rejected the challenge Jandro presents in *Delaney v. United States,* 263 U.S. 586, 44 S.Ct. 206, 68 L.Ed. 462 (1924), holding that there can be no challenge under the confrontation clause to the admission of a co-conspirator's out-of-court statement. Such statements clearly fall "outside the compass of the general hearsay exclusion." *Bourjaily,* 483 U.S. at 183, 107 S.Ct. at 2783. Furthermore, the court in *Dutton* ruled that evidentiary issues relating to the statements of a co-conspirator are more properly addressed under due process claims pursuant to the Fifth and Fourteenth Amendments than under the confrontation clause of the Sixth Amendment. We hold that the constitutional right to confrontation was not unlawfully denied or abridged.

The judgment and sentence is affirmed.

URBIGKIT, Justice, dissenting.

I dissent for two reasons. First, this majority removes from the Wyoming Confrontation Clause [1] our right to cross-examine an accuser [2] and does so without examining the Reserved Rights Clause.[3] This majority adopts for Wyoming the meaning assigned to the federal Confrontation Clause by *Bourjaily v. United States* [4] in order to remove a previous state constitutional right to cross-examine our accusers.[5]

---

1. Right of accused to defend.
   In all criminal prosecutions *the accused shall have the right* to defend in person and by counsel, to demand the nature and cause of the accusation, to have a copy thereof, *to be confronted with the witnesses against him,* * * *.
   Wyo. Const. art. 1, § 10 (emphasis added).

2. Reaffirmed in *Grable v. State,* 649 P.2d 663, 673 (Wyo.1982).

3. Rights not enumerated reserved to people.
   The enumeration in this constitution, of certain rights shall not be construed to deny, impair, or disparage others retained by the people.
   Wyo. Const. art. 1, § 36.

4. 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

5. *"Today, we conclude* that the second inquiry, independent indicia of *reliability, is also not mandated* by the Constitution." *Bourjaily,* 483 U.S. at 182, 107 S.Ct. at 2783, 97 L.Ed.2d at 157 (emphasis added). See n. 28 and then n. 12, *infra.*

I would preserve our right to confront an accuser and would hold the court is directed by our state constitution to consult the Reserved Rights Clause before decreasing the protective terrain surrounding Wyoming's Confrontation Clause. Second, after removing our right to cross-examine an accuser, this majority then insists on reaffirming the "inference standard"[6] rather than adopting the federal preponderance of the evidence standard[7] to decide when it is correct to admit against an accused citizen the testimony of an accuser who cannot be cross-examined. I would adopt for Wyoming the federal standard.

Luis A. Jandro is not the only person in Wyoming who lost the right to cross-examine his accusers when his conviction was affirmed. All of us have lost that right today. We are capable of better jurisprudence.[8] I dissent.

The chief controversy with which I am concerned questions the constitutionality of reducing the bulwark of an enumerated state right[9] without examining the relation between that reduction and the Reserved Rights Clause. I would argue here the Reserved Rights Clause shifts the burden of proof to the government to establish the new enumeration of the Wyoming Confrontation Clause, accomplished by reassigning to it a new and smaller scope, does not *deny, impair, or disparage* any right reserved to the people of Wyoming. The mistake made by the majority is in assuming that if the right to cross-examine an accuser in open court is located in our Confrontation Clause, then that right is extinguished when it is removed from the Confrontation Clause by adopting for Wyoming the federal Confrontation Clause which openly extinguishes that right under *Bourjaily*, 483 U.S. 171, 107 S.Ct. 2775. That assumption is false unless the propositions of law (rights) involved do not exhaust the logical space (amendments) they occupy.[10] Since there are other possibilities, I would argue the right to cross-examine an accuser in open court can *also* be located in the Reserved Rights Clause of the Wyoming Constitution.[11]

In this case, the majority adopts for Wyoming the new meaning assigned to the federal Confrontation Clause and supposes in the process to have annihilated the right to cross-examine an accuser by deleting it from the state's constitutional Confrontation Clause. This is done under the assumption that no right to confrontation can be located simultaneously within other open-textured provisions such as Due Process, Equal Protection, or Reserved Rights Clauses. The result in this case affirms Jandro's conviction for conspiracy to deliver methamphetamine in violation of W.S. 35–7–1031(a)(ii) and 35–7–1042 by a procedure denying his counsel the opportunity to cross-examine the "confidential informant" whose words were put into the mouth of Detective Stuhlmiller for court presentation against the accused. Permitting that testimony stands in stark contrast to our previous holdings that the Wyoming Confrontation Clause requires the prosecutor demonstrate the "unavailability" of a wit-

---

**6.** *See* n. 15, *infra.*

**7.** F.R.E. 801(d)(2)(E).

**8.** If the majority were to argue there has been no change to Wyoming's Confrontation Clause, then the decision below could be affirmed on the basis of *Grable*, 649 P.2d at 672–73 and that would foreclose the need to adopt for Wyoming the construction assigned the Confrontation Clause under *Bourjaily*, 483 U.S. 171, 107 S.Ct. 2775. *Cf. Bigelow v. State*, 768 P.2d 558 (Wyo. 1989). *See also Burke v. State*, 746 P.2d 852 (Wyo.1987) (Urbigkit, J., concurring in part and dissenting in part).

**9.** *See* n. 1, *supra.*

**10.** *See* Dworkin, *No Right Answer?*, 53 N.Y.U.L. Rev. 1 (1978).

**11.** I would also argue the Reserved Rights Clause shifts the burden to the government to demonstrate that that possibility is foreclosed. It would be extraordinary to require Wyoming constitutional "history to *confirm* the plain meaning" of the Reserved Rights Clause. *Bourjaily*, 483 U.S. at 178, 107 S.Ct. at 2780, 97 L.Ed.2d at 154 (emphasis in original). Requiring an accused citizen to prove the state constitution mandates an "indicia of reliability" is to deny or disparage the proposition. For if it is accepted, there is no need for proof.

ness and there be an "indicia of reliability"[12] prior to its current use as testimony.[13]

This court has jurisprudential responsibilities to the people of Wyoming which foreclose "selecting Supreme Court precedent on an ad hoc basis with the negative result-oriented appearance that accompanies such an approach." Keiter, *An Essay on Wyoming Constitutional Interpretation*, XXI Land & Water L.Rev. 527, 549 (1986). We should develop and incorporate "a principled basis for evaluating and incorporating Supreme Court precedent into state constitutional jurisprudence" if we feel incapable of developing our own interpretive model for understanding the Wyoming Constitution. *Id.* at 549.

First, this court adopts the basic liberty-right denial thesis and then goes on to

reject the *Bourjaily*[14] preponderance of the evidence standard for admitting alleged conspiracy statements against the federally accused under F.R.E. 801(d)(2)(E). Consequently, this court reaffirms the most base evidentiary standard[15] possible, which serves to strengthen the power of the prosecutor by concurrent destruction of a constitutional protection to any accused. After first rejecting the federal preponderance of the evidence standard, the majority then adopts for Wyoming the newest construction of the federal Confrontation Clause. This newest adaptation of confrontation and cross-examination diminishes severely the ability of the Wyoming judiciary to position itself between the power of the prosecutor and the constitutional protection of the accused citizen. We pick the worst of two worlds and fuse them into Wyoming law. We choose neither reliabili-

**12.** "The *indicia of reliability* is satisfied when the prior testimony was under oath, when defendant was represented by counsel, when the counsel could and did cross-examine the witness, and when the cross-examination which would be conducted at the trial would not touch upon any new and significantly material line of inquiry." *Martinez v. State,* 611 P.2d 831, 837 (Wyo.1980) (emphasis added).

**13.** *Rodriguez v. State,* 711 P.2d 410, 415 (Wyo. 1985); *Grable,* 649 P.2d 663.

**14.** 483 U.S. at 176, 107 S.Ct. at 2779, 97 L.Ed.2d at 152.

**15.** The majority states "[t]he proper exercise of discretion is demonstrated if the record encompasses sufficient evidence to permit the trial court to *infer* the existence of a conspiracy and the identity of its members." (Emphasis added.) Sometimes we label this "prima facie evidence." In *Dorador v. State,* 711 P.2d 417, 418–19 (Wyo.1985), we explained "prima facia in this context" can only be defined in terms which permit a reasonable inference that a conspiracy existed.

But the "inference" characterization restated by the majority advances no claim for quality of proof and thus does no work. An inference is a thought process for determination and not a standard of evidence for decision. The reasonableness of the inference addresses the logic of the decision and the stability of establishment of the underlying facts. "Inferences are deductions or conclusions which with reason and common sense lead the jury to draw from facts which have been established by the evidence in the case." Black's Law Dictionary 700 (5th ed.

1979). As this court in *Matter of Estate of Roosa,* 753 P.2d 1028, 1034 (Wyo.1988) quoted: "Guess-work cannot be substituted for evidence or inference, for 'an inference is the conclusion drawn on reason from premises established by proof. In a sense it is the thing proved. Guess-work is not.' *Whitehouse v. Bolster,* 95 Me. 458, 50 A. 240 [1901]." *Wright v. Conway,* 34 Wyo. 1, 241 P. 369, *reh. denied,* 34 Wyo. 42, 51, 242 P. 1107, 1110 (1926).

\*   \*   \*   \*   \*   \*

"An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." Cal.Evidence Code § 600(b) (West 1966).

Of course, the trial court must determine a conspiracy may have existed. The question begged by the majority and asked by Jandro is what is an acceptable "quantum of proof on which such determinations must be based," *Bourjaily,* 483 U.S. at 173, 107 S.Ct. at 2778, 97 L.Ed.2d at 151, in order to build a reasonably valid inference?

The validity of inference decision making is controlled by the adequacy and accuracy of the underlying facts, *Kobielusz v. Wilson,* 701 P.2d 559 (Wyo.1985), and the logical relationship of those facts to the derived conclusion. For example, it is cloudy—ergo, it may rain; it is cloudy—it will rain; it is cloudy—it did rain. The second is an invalid inference and the last is no inference at all since it only constitutes a statement of historical fact. The prohibition against an inference built upon an inference, 1A Wigmore, Evidence § 41 (Tillers rev. 1983), recognizes as invalid an escalation of stacked possibilities to reach a less likely probability. *Matter of Estate of Roosa,* 753 P.2d 1028.

ty nor necessity as the touchstone.[16]  Likewise, we serve not to preserve "the basic purpose of the [confrontation] clause, assuring the accused the right to confront and cross-examine his accusers in the presence of the fact finder which must determine his guilt or innocence."[17]

The *Bourjaily* preponderance requirement established at least some definable decisions by the trial court for admission of any statement allegedly made to further the course of a conspiracy between the accused and an alleged co-conspirator before that statement becomes part of the evidentiary menu served up to the jury.[18]  The *Bourjaily* court rested that standard on concerns voiced when Congress "enacted the Federal Rules of Evidence in 1975."[19]  While that standard does not bind the Wyoming courts, we should not forget entirely the admission of a conspiracy statement alleged by the prosecutor does not allow an "accused to confront the witness"[20] if the accuser cannot be cross-examined.  The fundamental right to confront and cross-examine the witness should be beyond question.[21]

The common argument advanced to circumvent the right to confront an accuser during a charge of conspiracy becomes a legal fiction busy chasing its own tail.  Because Confrontation Clause concerns once forbade the general use of hearsay by a prosecutor against an accused,[22] we declared not to be hearsay [23] the alleged conspiracy statement when the declarant is unavailable.  If we did not declare the alleged conspiracy statement is not hearsay, that statement could be mistaken for hearsay because it meets the definition of hearsay.[24]  But since we declared it not hearsay, the Confrontation Clause need not be consulted.[25]

Having rejected the only *Bourjaily* safeguard for the accused citizen, the majority then imports wholesale the current construction and interpretation assigned the Confrontation Clause by the United States Supreme Court [26] and requires that meaning be understood as · intended [27] by the Wyoming Confrontation Clause.  That requirement does not bridge the questions which surround it and requires a leap of faith I will not attempt across the abyss which now separates the old interpretation assigned our state Confrontation Clause from our newly adopted *Bourjaily* interpretation.[28]

**16.** Halpern, *The Confrontation Clause and the Search for Truth in Criminal Trials*, 37 Buffalo L.Rev. 165, 200 (1988–89).

**17.** Seidelson, *The Confrontation Clause, the Right Against Self–Incrimination in the Supreme Court: A Critique and Some Modest Proposals*, 20 Duq.L.Rev. 429, 461 (1982).

**18.** *Bourjaily*, 483 U.S. at 176 n. 1 and 186 n. 1, 107 S.Ct. at 2779 n. 1 and 2784 n. 1, 97 L.Ed.2d at 153 n. 1 and 159 n. 1.

**19.** *Bourjaily*, 483 U.S. at 177, 107 S.Ct. at 2780, 97 L.Ed.2d at 154.

**20.** Wyo. Const. art. 1, § 10.

**21.** *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *Pointer v. State of Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *People v. Anderson*, 43 Cal.3d 1104, 240 Cal.Rptr. 585, 742 P.2d 1306 (1987).

**22.** Jonakait, *Restoring the Confrontation Clause to the Sixth Amendment*, 35 UCLA L.Rev. 557 (1988); Note, *Richardson v. Marsh: Codefendant Confessions and the Demise of Confrontation*, 101 Harv.L.Rev. 1876 (1988).  *See also* Note, *Bourjaily v. United States: A New Rule for Admitting Coconspirator Hearsay Statements Under Federal Rule of Evidence 801(d)(2)(E)*, 1988 Wis.L.Rev. 577 (1988) and *Sixth Amendment— The Co–Conspirator Exemption to the Hearsay Rule: .The Confrontation Clause and Preliminary Factual Determinations Relevant to Federal Rule of Evidence 801(d)(2)(E)*, 78 J.Crim.L. & Criminology 915 (1988).

**23.** W.R.E. 801(d).

**24.** Hearsay is defined in W.R.E. 801(c) as a "statement, other than one made by the declarant while testifying at the trail or hearing, offered in evidence to prove the truth of the matter asserted."

**25.** Quod erat demonstrandum?

**26.** *See* n. 28, *infra.*

**27.** "[C]reative interpretation takes its formal structure from the idea of intention, not (at least not necessarily) because it aims to discover the purposes of any particular historical person or group but because it aims to impose purpose over the text or data or tradition being interpreted." R. Dworkin, *Law's Empire*, at 228 (1986).

I accept for now the established legal fiction that admits into the presence of the jury an alleged conspiratorial statement made by an unavailable declarant.[29] I do so only to preserve the stability of stare decisis.[30] But I do not accept any more erosion of our public right to confront our accusers openly in court. When a constitutional provision is newly construed to impair the previous scope of an enumerated right, as is done when the *Bourjaily* construction of the Confrontation Clause becomes our own, we should not neglect the Reserved Rights Clause located in Wyo. Const. art. 1, § 36.[31] What if we discover that enumerated rights are indeed located *within* a field of unenumerated rights? What do we then do as jurists if we are in pursuit of our own interpretive model to understand best the Wyoming Constitution?[32]

Perhaps we could put away quietly our sword of advocacy for the prosecution[33]

and devote fidelity to the Wyoming Constitution which, of course, includes the Reserved Rights Clause.[34] While such an "inclusive"[35] provision can "never be complete,"[36] perhaps we can make of Wyoming law the best it can be by including in our state's jurisprudence *all* provisions of the Wyoming constitution and by continuing the reasonable process and providing substantive protection.[37]

I would hold the Wyoming Confrontation Clause continues to contain the right to cross-examine the accuser and that this court is directed by our state constitution to consult the Reserved Rights Clause before we decrease the legal landscape which surrounds Wyoming's Confrontation Clause. Also to be noted are that inferences, as a sufficiency level for decision making, come clothed with all kinds of factual characteristics. We should beware of an

**28.** While *a literal interpretation of the Confrontation Clause* could bar the use of any out-of-court statements when the declarant *is* unavailable, this Court has rejected that view as "unintended and *too extreme.*" * * * Rather, *we have attempted to harmonize the goal of the Clause*—placing limits on the kind of evidence that may be received against a defendant—*with a societal interest in accurate fact-finding*, which may require consideration of out-of-court statements. *To accommodate these competing interests, the Court has,* as a general matter only, *required* the prosecution to demonstrate both the *unavailability* of the declarant *and* the "indicia of *reliability*" surrounding the out-of-court declaration. * * .* *Last Term* * * *, we held* that the first of these two generalized inquiries, *unavailability, was not required* when the hearsay statement is the out-of-court declaration of a co-conspirator. *Today, we conclude* that the second inquiry, independent indicia of *reliability, is also not mandated* by the Constitution. *Bourjaily*, 483 U.S. at 182, 107 S.Ct. at 2783, 97 L.Ed.2d at 157 (emphasis added). *See* Seidelson, *The Confrontation Clause and the Supreme Court: Some Good News and Some Bad News,* 17 Hofstra L.Rev. 51 (1988). *See also* Note, *Barker v. Morris and the Right? to Confrontation,* 14 Hastings Const. L.Q. 839 (1987).
Under what jurisdiction does the Rehnquist court privately amend the "goal of the Clause?" This is what the majority transforms into future Wyoming law? For historical perspective, see Goldman, *Not So "Firmly Rooted": Exceptions to*

the Confrontation Clause, 66 N.C.L.Rev. 1 (1987).

**29.** W.R.E. 801(d)(2)(E).

**30.** *Bigelow,* 768 P.2d 558; *Burke,* 746 P.2d 852; *Rodriguez,* 711 P.2d at 415.

**31.** *See* n. 3, *supra.*

**32.** *See* R. Dworkin, *Law's Empire, supra,* at 227–28.

**33.** " 'Courts have been sympathetic to this problem [of the prosecutor], * * *.' " *Bigelow,* 768 P.2d at 562 (quoting *Burke,* 746 P.2d at 855). " 'Courts have been sympathetic to this problem [of the prosecutor], * * *.' " *Burke,* 746 P.2d at 855 (quoting W. LaFave and A. Scott, Criminal Law at 460–61 (1972).

**34.** "Anyone who professes to take rights seriously, and who praises our Government for respecting them, must have some sense of what that point is." R. Dworkin, *Taking Rights Seriously,* at 198 (1978).

**35.** *See Gezzi v. State,* 780 P.2d 972 (Wyo.1989).

**36.** Barnett, *Reconceiving the Ninth Amendment,* 74 Cornell L.Rev. 1, 42 (1988). *See also* Symposium, *Interpreting The Ninth Amendment,* 64 Chi.–Kent L.Rev. 37 (1988).

**37.** *Burke,* 746 P.2d 852 (Urbigkit, J., concurring in part and dissenting in part); *United States v. Petersen,* 611 F.2d 1313 (10th Cir.1979), *cert. denied,* 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980).

innocuous adaptation of the thinking climate that the world is flat as an inference from our inability to visually observe the curvature. I would adopt for Wyoming the federal and otherwise generally accepted preponderance of the evidence requirement to decide when it is correct to admit against an accused citizen the testimony of an accuser who cannot be cross-examined, rather than the inference determination methodology articulated by this majority.

I regretfully and respectfully dissent in observing this accusatorial process where constitutional rights are denied to the charged defendant, but more expressively from this creation of a standard for future cases where the difference between guilt and innocence may be less distinctly drawn.